No. 10-5062
ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MAXWELL HODGKINS, ET AL.,

Plaintiffs-Appellants,

v.

ERIC H. HOLDER, JR.,

Defendant-Appellee.

Appeal from a Judgment of the
United States District Court for the District of Columbia
The Hon. James Robertson, District Judge
(Dist. Ct. No. 1:09-cv-00587-JR)

APPELLANTS' BRIEF

Alan Gura
Thomas M. Huff
GURA & POSSESSKY, PLLC
101 N. Columbus Street
Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665

*Counsel for Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

*A.     Parties and Amici*

The parties in the district court were plaintiffs Maxwell Hodgkins, Stephen Dearth, and The Second Amendment Foundation; and defendant Eric J. Holder, Jr. All parties below are parties before this Court in this appeal. Hodgkins, however, has moved to dismiss his appeal pursuant to a consent motion.

There were no amici below for either party. At present, there are no known amici parties appearing before this Court on this appeal.

*B.     Rulings Under Review*

The rulings under review are contained within the district court's Order and Memorandum Opinion, both issued on January 5, 2010 by the Hon. James Robertson, granting Defendant's Motion to Dismiss. The district court's opinion is published at *Hodgkins* v. *Holder*, 677 F. Supp. 2d 202 (D.D.C. 2010). The ruling under review and judgment being appealed are set forth in the Joint Appendix at JA 3-12.

*C.*    *Related Cases*

The case on review has not previously been before this or any other court apart from the original proceeding in the United States District Court. Counsel is not aware of any related cases pending before this or any other court.

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Second Amendment Foundation, Inc., ("SAF") has no parent corporations. No publicly traded company owns 10% or more of its stock.

SAF, a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code, is a non-profit educational foundation incorporated in 1974 under the laws of the State of Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 650,000 members and supporters residing throughout the United States.

TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases. . . . . . . . . . . . . . . i

Corporate Disclosure Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Jurisdictional Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statutes and Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       1.    Plaintiff Stephen Dearth and the Challenged Laws. . . . . . . 5

       2.    Dearth's Attempts to Purchase Firearms. . . . . . . . . . . . . . 8

       3.    The First Lawsuit in Ohio. . . . . . . . . . . . . . . . . . . . . . . . . . 10

       4.    This Action in the District of Columbia. . . . . . . . . . . . . . . 12

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.    The Standard of Review in this Case is De Novo. . . . . . . . . . . . 16

II.    Dearth Suffers an Injury-in-Fact as a Direct Result of the
       Challenged Federal Enforcement Scheme.................... 16

       A.    The Administrative Denials of Dearth's Firearm
             Purchase Attempts Constitute Injuries-in-Fact. ........ 17

       B.    Dearth Suffers an Ongoing Injury as a Result of
             Defendant's Administrative Denial of
             Firearms Purchases.................................. 21

III.   *Navegar*'s Heightened "Imminence" Standard for
       Pre-Enforcement Standing Contradicts Intervening Supreme
       Court Precedent and Should Be Abandoned.................. 25

       A.    Standing to Assert a Pre-Enforcement Challenge is
             Established Whenever a Plaintiff Foregoes Activity
             Based on a Credible Fear of Enforcement. ............. 26

       B.    Requiring an "Imminent" Rather Than "Credible" Threat
             of Prosecution Imposes an Improperly-Heightened
             Standard for Testing a Criminal Law's Constitutionality.   30

       C.    As the District Court Observed, Its Application of the
             *Navegar* Rule to this Case Prevents Any Constitutional
             Challenge to the Laws at Issue Absent Exposure to
             Criminal Prosecution................................ 35

       D.    *Navegar* Cannot be Applied in a Manner Consistent
             with Intervening Supreme Court Precedent. ........... 37

       E.    *Navegar*'s Pre-Enforcement Standing Requirement
             of an "Imminent" Threat of Prosecution Has Proven
             Unworkable. ...................................... 40

v

IV.  The Second Amendment Foundation Has Organizational
     and Representational Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

     A.  SAF Has Organizational Standing. . . . . . . . . . . . . . . . . . . .  45

     B.  SAF Has Representational Standing. . . . . . . . . . . . . . . . .  46

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

vi

# TABLE OF AUTHORITIES

Cases

*Abbott Labs.* v. *Gardner*,
　　387 U.S. 136 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*Aetna Life Insurance Co.* v. *Haworth*,
　　300 U.S. 227 (1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Babbitt* v. *United Farm Workers Nat'l Union*,
　　442 U.S. 289 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*\*Bach* v. *Pataki*, 408 F.3d 75
　　(2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19, 20

*Bronson* v. *Swensen*,
　　500 F.3d 1099 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . .   29

*Carhart* v. *Gonzales*,
　　413 F.3d 791 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

*Chisolm* v. *TranSouth Fin. Corp.*,
　　95 F.3d 331 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

*Cutaiar* v. *Marshall*,
　　590 F.2d 523 (3d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Dawson* v. *Scott*,
　　50 F.3d 884 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

*Dearth* v. *Mukasey*,
　　516 F.3d 413 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

*Cases upon which we chiefly rely are marked with an asterisk.

*District of Columbia* v. *Heller*,
  128 S. Ct. 2783 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*DKT Memorial Fund Ltd.* v. *Agency for Int'l Dev.*,
  887 F.2d 275 (D.C. Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*Doe* v. *Bolton*,
  410 U.S. 179 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Doe* v. *Duling*,
  782 F.2d 1202 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Donovan* v. *United States Postal Service*,
  530 F. Supp. 894 (D.D.C. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

*Epperson* v. *Arkansas*,
  393 U.S. 97 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Fair Employment Council* v. *BMC Mktg. Corp.*,
  28 F.3d 1268 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

*Franchise Tax Bd. of California* v. *Constr. Laborers Vacation Trust*,
  463 U.S. 1 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Fraternal Order of Police* v. *United States*,
  152 F.3d 998 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

*Galbraith* v. *County of Santa Clara*,
  307 F.3d 1119 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

*Golden* v. *Zwickler*,
  394 U.S. 103 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 23

**Grid Radio* v. *FCC*,
  278 F.3d 1314 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Haitian Refugee Ctr.* v. *Gracey*,
    809 F.2d 794 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Havens Realty Corp.* v. *Coleman*,
    455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Hodgkins* v. *Holder*,
    677 F. Supp. 2d 202 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Houghton* v. *Shafer*,
    392 U.S. 639 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Int'l Brotherhood of Teamsters* v. *United States*,
    431 U.S. 324 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Laird* v. *Tatum*,
    408 U.S. 1 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Lujan* v. *Defenders of Wildlife*,
    504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 28

*Marbury* v. *Madison*,
    5 U.S. (1 Cranch.) 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Maryland State Conf. of NAACP Branches* v. *Maryland Dep't of State Police*, 72 F. Supp. 2d 560 (D. Md. 1999) . . . . . . . . . . . . 30

*\*Medimmune, Inc.* v. *Genentech, Inc.*,
    549 U.S. 118 (2007). . . . . . . . . . . . . . . . . . 4, 5, 15, 25, 27, 37, 39

*Miller* v. *Gammie*,
    335 F.3d 889 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Mobil Oil Co.* v. *Attorney Gen. of Va.*,
    940 F.2d 73 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Moses* v. *Howard Univ. Hosp.*,
606 F.3d 789 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Navegar, Inc.* v. *United States*,
103 F.3d 994 (D.C. Cir. 1997). . . . . . 2, 12, 15, 25, 27, 31, 32, 39, 40

*New Hampshire Hemp Council, Inc.* v. *Marshall*,
203 F.3d 1 (1st Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*New Hampshire* v. *Maine*,
532 U.S. 742 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Ord* v. *District of Columbia*,
587 F.3d 1136 (D.C. Cir. 2009) . . . . . . . . . . . . . 4, 15, 24, 25, 28, 41

*O'Donoghue* v. *United States*,
289 U.S. 516 (1933). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Parker* v. *District of Columbia*,
128 S. Ct. 2994 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*\*Parker* v. *District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . 17, 21, 33, 35, 38, 39

*People's Rights Organization* v. *City of Columbus*,
152 F.3d 522 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . 32, 44

*Prayze FM* v. *FCC*,
214 F.3d 245 (2nd Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Pruess* v. *Udall*,
359 F.2d 615 (D.C. Cir. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Reno* v. *ACLU*,
521 U.S. 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

x

*Seegars* v. *Ashcroft*,
  396 F.3d 1248 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . .  32, 33, 39, 44

*Seegars* v. *Gonzales*,
  413 F.3d 1 (D.C. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . .  33, 38

*Stafford* v. *Briggs*,
  444 U.S. 527 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*United Food & Commercial Workers Union Local*
  *751* v. *Brown Group, Inc.*, 517 U.S. 544 (1996). . . . . . . . . . . . . .  47

*United States* v. *Burke*,
  781 F.2d 1234 (7th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . .  38

*United States* v. *Lancellotti*,
  761 F.2d 1363 (9th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . .  38

*United States* v. *Nachtigal*,
  507 U.S. 1 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

*Warth* v. *Seldin*,
  422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 45

*White* v. *Estelle*,
  720 F.2d 415 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . .  38

Constitutional Provisions

U.S. Const., art. III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Statutes, Regulations, and Court Rules

18 U.S.C. § 922(a)(5)................................................... 7

18 U.S.C. § 922(a)(9) ............................................... 1, 8

18 U.S.C. § 922(b)(3)............................................... 1, 7, 8

18 U.S.C. § 922(g)...................................................... 6

18 U.S.C. § 922(v)(1)................................................... 31

27 C.F.R. § 478.124(c)(1)........................................... 9, 18

28 U.S.C. § 1291 ....................................................... 1

28 U.S.C. § 1331 ....................................................... 1

28 U.S.C. § 1343........................................................ 1

28 U.S.C. § 1391.................................................... 10, 44

28 U.S.C. § 1404(a)................................................ 11, 13

28 U.S.C. § 2201........................................................ 3

42 U.S.C. § 1983....................................................... 21

47 U.S.C. § 301........................................................ 20

47 U.S.C. § 501........................................................ 20

Fed. R. Civ. P. 12(b)(1)................................................ 1

18 U.S.C. § 922(a)(5)................................................... 7

18 U.S.C. § 922(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9

18 U.S.C. § 922(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 9

18 U.S.C. § 922(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 922(v)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

27 C.F.R. § 478.124(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 19

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1391. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 26

28 U.S.C. § 1404(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

28 U.S.C. § 2201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

47 U.S.C. § 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

47 U.S.C. § 501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants ("Plaintiffs") seek declaratory and injunctive relief against enforcement of certain federal firearms laws that violate the United States Constitution. The district court had subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343.

This Court has jurisdiction under 28 U.S.C. § 1291. On January 5, 2010, the district court entered an Order granting Defendant-Appellee's motion to dismiss for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1). Plaintiffs-Appellants filed a Notice of Appeal on March 3, 2010.

## STATEMENT OF ISSUES

1. Do individuals currently prevented from obtaining firearms, and whose previous attempts to obtain firearms were thwarted, by 18 U.S.C. §§ 922(a)(9) and (b)(3), suffer an injury-in-fact?

2. In a constitutional pre-enforcement challenge to criminal enactments, must plaintiffs identify a specific threat of imminent prosecution to establish standing?

3. Does a membership organization whose members are impacted by particular federal criminal laws, and which expends resources as a result of these laws, have standing to challenge the laws' constitutionality?

## STATUTES AND REGULATIONS

An addendum contains the following:

28 U.S.C. § 2201; 18 U.S.C. §§ 922(a)(5), (a)(9), and (b)(3); and 27 C.F.R. § 478.124(c)(1)

## STATEMENT OF THE CASE

Plaintiffs challenge federal laws barring their exercise of a fundamental, enumerated constitutional right, a disability imposed for the sole reason that they reside overseas and lack a residence within an American state. However, this important constitutional case has not been allowed to proceed on the merits – and is effectively barred from ever being heard by a federal court – owing to an interpretation of this Circuit's unique "pre-enforcement standing" rule first articulated in *Navegar, Inc.* v. *United States*, 103 F.3d 994 (D.C. Cir. 1997), which purports to limit pre-enforcement challenges by plaintiffs who cannot demonstrate a sufficiently "imminent" threat of prosecution.

2

As the lower court observed, the "*Navegar* rule" is especially problematic in this case. JA 8. Because of the particular characteristics of the laws at issue here, no prospective plaintiff can expect to be "threatened" by government action and so "the only way [these laws] can be challenged in this Circuit is to engage in a forbidden transaction, exposing oneself to prosecution." *Id*.

Thus, Plaintiffs have effectively been told that if they wish to challenge the law, they must first violate it. This is plainly inconsistent with the requirements of Article III, and with the Declaratory Judgment Act. Reversal is mandatory.

Congress' 1934 passage of the Declaratory Judgment Act was supposed to have remedied this very situation, granting federal courts the power to declare the rights of individuals as an independent form of judicial relief. *See* 28 U.S.C. § 2201. Plaintiffs' "predicament—submit to a statute or face the likely perils of violating it—is precisely why the declaratory judgment cause of action exists." *Mobil Oil Co.* v. *Attorney Gen. of Va.*, 940 F.2d 73, 74 (4th Cir. 1991).

Before the Supreme Court and other appellate circuits, this issue raises little controversy. While these courts require a "credible" fear of enforcement (thus weeding out challenges to statutory relics that no prosecutor is likely to assert), the Supreme Court has affirmatively disclaimed an additional requirement of "imminence." *Medimmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118,129 (2007). Nevertheless, that standard has persisted in this Circuit, frequently "turn[ing an] easy case into a close call; and worse, [making] access to federal court depend on the government's litigation strategy." *Ord* v. *District of Columbia*, 587 F.3d 1136, 1147 (D.C. Cir. 2009) (Brown, J., dissenting in part).

Fortunately, Plaintiffs have another independent source of standing available in this case. As outlined below, Dearth has been administratively denied the ability to purchase firearms as the direct result of the challenged federal enforcement scheme. This alone constitutes an injury-in-fact sufficient to reverse the lower court.

But assuming that the *Navegar* rule could in fact be stretched to deny Dearth standing, the rule has reached its breaking point. Indeed, the Supreme Court has unambiguously declared in an intervening opinion

4

that a plaintiff may challenge the constitutionality of a criminal law without being "requir[ed] . . . to expose himself to liability" in the form of prosecution, *Medimmune*, 549 U.S. at 129. An application of *Navegar*'s heightened standing requirements to the facts of this case must be abandoned for doing precisely that.

Finally, Plaintiff-Appellant SAF also has standing in this case. SAF has representational standing to sue on behalf of affected members such as Dearth, and organizational standing to challenge a law that impacts its members and consequently causes it to expend resources.

## STATEMENT OF FACTS

1.   *Plaintiff Stephen Dearth and the Challenged Laws.*

Plaintiff-Appellant Stephen Dearth is a natural-born American citizen who resides in Canada and does not maintain a residence within the United States. JA 17, ¶ 2. Although Dearth resides abroad, he has several friends and relatives in the United States whom he enjoys visiting, and whom he intends to continue visiting on a regular basis. JA 18, ¶ 10. Dearth also intends to purchase firearms within the United States, which he would store securely at his relatives' home in Mount

5

Vernon, Ohio. JA 18, ¶ 11. He intends to access firearms for a variety of purposes while visiting the United States, including self-defense and lawful sporting purposes. *Id*.

Dearth does not face any of the typical disqualifying barriers under the federal gun control laws. He is over the age of 21, not under indictment, has never been convicted of a felony or misdemeanor crime of domestic violence, is not a fugitive from justice, is not an unlawful controlled substance user or addict, has never been adjudicated as a mental defective or committed to a mental institution, has not been discharged from the Armed Forces under dishonorable conditions, has never renounced his citizenship, and has never been the subject of a restraining order relating to an intimate partner. JA 19, ¶ 12; *cf*. 18 U.S.C. § 922(g) (defining categories of persons prohibited from possessing firearms). Moreover, Dearth holds a valid Utah permit to publicly carry a handgun, which is recognized in numerous states. JA 19, ¶ 12.

But owing to the fact that Dearth resides abroad, the United States significantly curtails his ability to possess and use firearms. Federal law

prohibits any person "who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes." 18 U.S.C. § 922(a)(9). A related provision further bans, with some exceptions, any licensed firearms dealer[1] from completing a firearms transaction with any person the dealer "knows or has reasonable cause to believe" resides out of State. 18 U.S.C. § 922(b)(3).

Thus, despite Dearth's American citizenship, the fact that he resides abroad and does not maintain a home in any U.S. State means that he is barred from receiving any firearm for any purpose other than temporary sporting use. As the government explained to the lower court:

> [W]hile *those U.S. citizens who only reside abroad will be effectively prohibited from receiving firearms for purposes other than sporting purposes while in the United States*, those U.S. citizens who generally reside abroad but continue to maintain a home in the United States may purchase firearms in that State for any purpose while they are residing in their United States home.

Def. Mot. to Dismiss, 6/26/09, 7-8 (emphasis added).

[Plaintiff Hodgkins, an American residing in the United Kingdom, is similarly situated and thus suffers from the same disabilities when

---

[1]A virtually identical ban applies to transfers of firearms from persons who are not licensed dealers. *See* 18 U.S.C. § 922(a)(5).

7

visiting the United States. Hogkins is returning to reside in the United States, and therefore has chosen not to pursue his appeal.]

Notably, the ban applies only to newly-acquired firearms. As the government conceded, expatriated Americans may fully access and use firearms they obtained prior to moving overseas. Def. Mot. to Dismiss, 6/26/09, 19.

Defendant Holder is responsible for enforcing these laws against individuals such as Dearth and presently does so. JA 17, ¶ 4.

2. *Dearth's Attempts to Purchase Firearms*

Dearth has done more than merely express his intention to purchase and store firearms in the United States for such purposes as self-defense. Dearth has twice attempted to purchase firearms within the United States, and both times his attempts were thwarted by operation of the federal enforcement scheme he challenges.

To facilitate implementation of the federal firearms laws—including 18 U.S.C. §§ 922(a)(9) and (b)(3)—prospective firearms purchasers are required to fill out and provide the seller with a copy of Form 4473, which is administered under Defendant's authority. JA 20, ¶ 17; *see also*

8

27 C.F.R. § 478.124(c)(1). Question 13 of this form asks the buyer to list his or her State of residence, if any. *Id*. If an American citizen otherwise fully qualified to buy a firearm cannot provide an answer to this question, the firearms transaction must be cancelled. *Id*. at ¶ 18.

In January of 2006, unaware of these laws, Dearth attempted to purchase a firearm from a dealer within the United States. JA 21, ¶ 22. However, he could not provide a response to Question 13 on Form 4473, and advised the dealer that he does not reside in any State. *Id*. On account of  Dearth's foreign residence and inability to answer Question 13, the transaction was terminated. *Id*. Dearth subsequently spoke with an official at the Federal Bureau of Investigations, who confirmed that Dearth could not adequately complete Form 4473, and could not purchase a firearm because he lacked a domestic residence. *Id*.

In June of 2007, Dearth again attempted to purchase a firearm within the United States. JA 21, ¶ 23. Dearth truthfully advised the seller that he did not reside in any State, which again prevented the effectuation of his firearms purchase. *Id*. Dearth reasonably fears criminal penalties if he were to provide false state residence information

9

on a Form 4473 in order to purchase a firearm. JA 21, ¶ 21. Moreover,

he cannot make a retail purchase of a firearm if he truthfully declines to

provide a state of residence on a Form 4473. *Id.*

   3. *The First Lawsuit in Ohio.*

   Dearth first challenged the federal laws described above by filing suit

in November of 2006 in the U.S. District Court for the Southern District

of Ohio, seeking declaratory and injunctive relief from their enforcement

against him and others similarly situated. Dearth originally chose this

forum because he primarily intended to exercise his rights in his

hometown of Mount Vernon, Ohio and, mindful that Congress had

established nationwide venue against the federal government in civil

actions, *see Stafford* v. *Briggs*, 444 U.S. 527 (1980), believed this to be a

district where "a substantial part of the . . . omissions giving rise to the

claim occurred." 28 U.S.C. § 1391(e)(2).

   Plaintiff Second Amendment Foundation, Inc. ("SAF") joined Dearth

in the Ohio lawsuit. SAF is a non-profit membership organization with

over 650,000 members and supporters that seeks to preserve the

effectiveness of the Second Amendment through educational and legal

action programs. JA 17, ¶ 3. Its activities include "education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control." *Id*. It engages in these activities with respect to numerous firearms laws, including the federal laws at issue on appeal here.

The government moved to dismiss the case for improper venue, and further requested that the litigation be transferred to the U.S. District Court for the District of Columbia under 28 U.S.C. § 1404(a) on convenience grounds. The government did not, however, raise the issue of standing.

Ultimately, the government prevailed on its motion to dismiss. Venue was found to be improper in the Southern District of Ohio, though the district court granted Dearth's request for dismissal without prejudice rather than transfer so that he could appeal immediately. *See* JA 9. Dearth's appeal of the venue issue was ultimately unsuccessful. *Dearth* v. *Mukasey*, 516 F.3d 413 (6th Cir. 2008).

11

4. *This Action in the District of Columbia.*

Having unsuccessfully sought venue in Ohio, Dearth and SAF, joined by Plaintiff Hodgkins, filed suit on March 27, 2009 in the U.S. District Court for the District of Columbia, *see* JA 16-26,—the same forum to which the government had sought transfer out of Ohio on convenience grounds.[2] But the government again filed a motion to dismiss, this time for lack of standing. The government argued that Dearth had not been sufficiently singled out for prosecution and thus lacked standing to sue pursuant to this Circuit's elevated requirements for "pre-enforcement" challenges under the Declaratory Judgment Act. *See*, *e.g.*, *Navegar*, 103 F.3d 994.

Plaintiffs responded that Dearth had standing independent of this Circuit's "pre-enforcement standing" requirements because he had already suffered an injury-in-fact—namely, that his two previous attempts to purchase firearms were thwarted by a federal enforcement scheme administered by Defendant Holder. Moreover, as expressed by

---

[2]Hodgkins and SAF challenged the same laws in the United States District Court for the Northern District of Texas, where Hodgkins sought to exercise Second Amendment rights while living overseas. His lawsuit, too, was dismissed without prejudice on venue grounds.

12

several of this Court's judges, Plaintiffs argued that this Circuit's elevated requirements for pre-enforcement standing under *Navegar* have been rejected by Supreme Court precedent and should accordingly be abandoned. Finally, Plaintiffs urged that the government should be estopped from raising a standing argument at all, on the grounds that it sought to have the case transferred to this very forum under the venue transfer statute. That statute requires any transfer to be to a district "in which [the case] might have been brought." *See* 28 U.S.C. § 1404(a).

The District Court granted the government's motion to dismiss, JA 12, labeling his previously-denied attempts to purchase firearms as "past injuries alone," JA 5-6, and then characterizing Dearth's claim as a pre-enforcement challenge barred by *Navegar*. JA 6-8.

The District Court observed that *Navegar*'s application was especially problematic in this case, effectively preventing  Dearth's dispute from ever being heard on the merits by an Article III court outside of the criminal context. JA 8 (citations omitted). Nevertheless, it found the *Navegar* line of cases to be on point, and concluded that it had no choice but to "faithfully apply" them. *Id*. The lower court also concluded that

13

SAF, which it termed an "organization of gunmen,"[3] JA 4, did not have

organizational or representational standing. JA 10-11.

## SUMMARY OF ARGUMENT

Dearth plainly has standing to challenge the government's

enforcement of a statutory scheme preventing him from purchasing

firearms. First, independent of this Circuit's unique "imminence"

requirement for pre-enforcement standing, it is well-established that a

plaintiff who has been administratively denied permission to engage in

some desired conduct suffers an injury-in-fact giving rise to Article III

standing. The government—through operation of a federal enforcement

scheme administered by Defendant Holder—has administratively denied

Dearth's two separate attempts to purchase firearms. Under this

Circuit's established precedents, Dearth has proper standing to sue.

Secondly, even framed as a pure pre-enforcement challenge, Dearth's

predicament amply demonstrates why civil rights litigants "should not

be required to jump through such hoops to get past the courthouse door."

---

[3]SAF takes exception to this characterization. SAF's members and
supporters are law-abiding, and most SAF-sponsored litigation is
brought on behalf of at least one female plaintiff.

14

*Ord*, 587 F.3d at 1146 (BROWN, J., dissenting in part). As the lower court recognized, applying the *Navegar* rule to this case and its heightened requirement of an "imminent" threat of prosecution would bar Dearth from *ever* challenging the laws at issue here unless he is willing to affirmatively break those laws and expose himself to criminal prosecution. JA 8.

Intervening Supreme Court precedent has severely undermined *Navegar*'s core holding, and foreclosed its applicability to Dearth's case. While the Supreme Court does require a "credible" fear of enforcement, an additional "imminence" requirement has been affirmatively disclaimed. *Medimmune*, 549 U.S. at 129. The Court has unambiguously declared that a plaintiff may challenge the constitutionality of a criminal law without being "requir[ed] . . . to expose himself to liability" in the form of prosecution. *Id*.

The lower court's application of *Navegar*'s heightened standing requirements to the facts of this particular case must be reversed for doing precisely that.

15

Finally, SAF has both organizational and representational standing under well-established precedent. SAF's members include individuals such as Dearth (and Hodgkins) directly affected by the laws at issue here, and SAF further expends resources as a result of those laws.

## ARGUMENT

## I. THE STANDARD OF REVIEW IN THIS CASE IS DE NOVO.

A lower court's adjudication of a motion to dismiss under Fed. R. Civ. P. 12(b)(1) is reviewed de novo on appeal. *Ord*, 587 F.3d at 1140. This Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Id.* (quoting *Warth* v. *Seldin*, 422 U.S. 490, 501 (1975)).

## II.    DEARTH SUFFERS AN INJURY-IN-FACT AS A DIRECT RESULT OF THE CHALLENGED FEDERAL ENFORCEMENT SCHEME.

The three familiar elements of standing are injury-in-fact, causation by the defendants, and redressability. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The government does not suggest that its enforcement of federal gun laws has no impact upon Plaintiffs' behavior, or that the courts are powerless to address the situation. The dispute centers on the first element, injury-in-fact.

16

Plaintiffs obviously suffer an actual disability.

## A.    The Administrative Denials of Dearth's Firearm Purchase Attempts Constitute Injuries-in-Fact.

Independent of this Circuit's requirements for pre-enforcement standing, it is a well-established tenet of Article III standing that an individual suffers justiciable injury when the government administratively denies his or her permission to engage in some desired conduct. An administrative denial is not a mere threat of hypothetical criminal enforcement in the future; rather, it is an injury-in-fact that currently restrains the desired actions of the denied party. In short, when the government says "no," a justiciable controversy exists. *See Parker* v. *District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007) (collecting cases),[4] *aff'd sub nom District of Columbia* v. *Heller*, 128 S. Ct. 2783 (2008).

Dearth has made two unsuccessful attempts to purchase firearms, both of which have been thwarted by a federal enforcement scheme

---

[4]Notably, while Judge Henderson dissented from the panel's ruling on the merits, she agreed that the denial of  Heller's permit application afforded him standing. *Parker*, 478 F.3d at 402 n.2 (Henderson, J., dissenting).

17

administered by Defendant Holder. Defendant requires prospective

purchasers of firearms—such as Dearth—to fill out ATF Form 4473. JA

20, ¶ 17; *see also* 27 C.F.R. § 478.124(c)(1). Question 13 of that form

requires the purchaser to list his or her State of residence, if any. *Id*.

And if an American citizen otherwise fully qualified to buy a firearm

cannot provide an answer to this question, the firearms transaction

must be cancelled. *Id*. at ¶ 18.

Because Dearth—as a United States citizen who resides outside the

country—was (and still is today) unable to provide an answer to

Question 13, his transactions were cancelled. This was confirmed by an

FBI agent, and the government does not dispute that this was the

correct result under the challenged laws. Accordingly, Dearth suffers an

ongoing injury-in-fact. This is an independent source of standing

sufficient to reverse the lower court.

In fact, it is doubtful that even this much should be required of

Dearth to establish standing. A well-established corollary to the basic

rule that Article III standing arises upon some negative governmental

action is the futile act doctrine: if circumstances make clear that an

administrative application is hopeless, a plaintiff need not go through

the futile ritualistic act of submitting paperwork. *See, e.g. Int'l*

*Brotherhood of Teamsters* v. *United States*, 431 U.S. 324, 365-66 (1977)

(minority job applicants need not test a "whites only" sign before filing a

Title VII claim); *Houghton* v. *Shafer*, 392 U.S. 639, 640 (1968) (per

curiam) (inmate need not file hopeless administrative appeal to sustain

a facial challenge).

The Second Circuit's holding in *Bach* v. *Pataki*, 408 F.3d 75 (2nd Cir.

2005) is instructive. In *Bach*, the plaintiff, a Virginia resident,

frequently visited his parents in New York, and challenged that state's

prohibition on the issuance of firearms carry permits to those who

neither permanently reside nor work in the state. Because the

prohibition clearly applied to the plaintiff, he did not bother applying for

a firearms permit. Both the District Court and the Second Circuit

rejected a standing challenge:

> The State Police informed Bach that he was statutorily ineligible for
> a carry license. Bach had nothing to gain thereafter by completing
> and filing an application . . . . Imposing a filing requirement would
> force Bach to complete an application for which he is statutorily
> ineligible and to file it with an officer without authority to review it.

19

We will not require such a futile gesture as a prerequisite for adjudication in federal court.

*Id.* at 82-83 (footnotes, citations and internal quotation marks omitted). This is no different from forcing Death to attempt completion of Form 4473 (although, of course, he has already attempted to do so).

Precedent in this Circuit is in accord. In *Grid Radio* v. *FCC*, 278 F.3d 1314 (D.C. Cir. 2002), an unlicensed radio broadcaster challenged the constitutionality of the FCC's ban on microbroadcasting. The FCC asserted that because the broadcaster had not applied for a license, he lacked standing to challenge the policy forbidding the issuance of such licenses. This Court rejected the claim:

> The record before us is clear: But for the ban, Szoka would have applied for a license, and the Commission points to no individual characteristics of either Szoka or Grid Radio that would have led it categorically to deny his application in the absence of the ban.

*Id.* at 1319 (*citing Prayze FM* v. *FCC*, 214 F.3d 245, 251 (2nd Cir. 2000)).

Had the broadcaster decided to simply broadcast without an FCC permit, he would have been in criminal violation of 47 U.S.C. § 301 and subject to the penalties of 47 U.S.C. § 501. Yet this Court did not require the broadcaster to allege, much less prove, an imminent threat of

prosecution. Instead, the ban on the issuance of permits created an injury-in-fact because it deterred the plaintiff's desired behavior.

Dearth's injury here is no different from that in *Bach* or *Grid Radio*—except that he has actually taken the extra step of testing the law by seeking to complete Form 4473. His injury is also identical to that in *Parker*, where an unsuccessful handgun registration attempt "constitute[d] an injury independent of the District's prospective enforcement of its gun laws." *Parker*, 478 F.3d at 376.

## B.    Dearth Suffers an Ongoing Injury Due to Defendant's Administrative Denial of Firearms Purchases.

The government distinguished *Parker* before the lower court on the grounds that it concerned an action under 42 U.S.C. § 1983, rather than the Declaratory Judgment Act. It argued that while Section 1983 allows for relief from past injuries, the Declaratory Judgment Act "do[es] not provide a remedy for past injuries, but only for a 'specific live grievance.'" Mot. to Dismiss, 6/26/09, 17 (*quoting Golden* v. *Zwickler*, 394 U.S. 103, 110 (1969)). Thus, the government claims that the repeated Dearth's ability to purchase firearms amount merely to a series of *past* injuries, not a live ongoing one.

21

Notwithstanding its acceptance by the lower court, this argument borders on the frivolous, and fails on multiple levels.

As a starting point, the argument erroneously assumes that the *past occurrence* of one of more injurious events necessarily precludes the existence of a *current* case or controversy. But the injury resulting from an administrative denial does not simply vanish from existence once the ink has dried on the stamped disapproval. To the contrary, the enforcement scheme that has twice thwarted Dearth's efforts to purchase firearms continues to do so today. If standing is denied on the theory that Dearth's injuries from being denied permission to purchase firearms are now in the past, then standing would likewise be denied in any of the administrative cases routinely heard in this Court.

Indeed, on this view, the Supreme Court should never have reached the merits in *Marbury* v. *Madison*, 5 U.S. (1 Cranch.) 137 (1803), because Madison's refusal to deliver Marbury's judicial commission was a completed event that occurred in the past, regardless of how aggrieved Marbury might have been in bringing the action.

22

To be sure, the Declaratory Judgment Act's text does refer to a live case or controversy. However, this is best understood as referring to the *constitutional* requirement—*i.e.*, the same requirements Article III imposes in all cases. *See*, *e.g.*, *Cutaiar* v. *Marshall*, 590 F.2d 523, 527 (3d Cir. 1979) ("[The Supreme Court has] held that the Declaratory Judgment Act requirement of an 'actual controversy' is identical to the constitutional requirement of 'cases' and 'controversies'") (citing *Aetna Life Insurance Co.* v. *Haworth*, 300 U.S. 227, 239-40 (1937); *see also Franchise Tax Bd. of California* v. *Constr. Laborers Vacation Trust*, 463 U.S. 1, 17 (1983) (the Declaratory Judgment Act "was intended to affect only the remedies available in a federal district court, not the court's jurisdiction").[5]

Section 1983 affords declaratory and injunctive relief against the District of Columbia in federal court. The Declaratory Judgment Act

---

[5] These cases notwithstanding, the district court observed that this principle has not been strictly followed. *See* JA 5-6, n.1. In *Golden* v. *Zwickler*, 394 U.S. at 108-110, for example, a plaintiff's prior arrest failed to support a Declaratory Judgment action where the plaintiff could not show that the arrestable offense was likely to reoccur. But whether "strictly" observed or not, the principle certainly applies to a case that implicates an administrative denial like this one.

provides the same remedies against the remainder of the federal government. It makes no sense to claim that Section 1983 reaches the District government's administrative gun permit denial, but standing concerns prevent the Declaratory Judgment Act from doing likewise with respect to the Justice Department.

"There is nothing unique about suits brought under the DJA that requires a special jurisdictional analysis," *Ord*, 587 at 1147 (Brown, J., dissenting in part), and so there is no reason why Article III should govern Declaratory Judgment Act cases differently than it does all other types of cases. Standing is standing. It either exists, or it does not. While it is true that Congress has enacted a wide variety of statutes (including Section 1983) for the purpose of resolving "cases or controversies" dealing with different government actors, this unremarkable fact has no relevance to Dearth's standing.

Because it is indisputable that an administrative denial is an injury-in-fact for Article III purposes, the government's denial of Dearth's ability to purchase firearms here must trigger the Court's authority under the Declaratory Judgment Act.

24

III.  **_NAVEGAR_'S HEIGHTENED "IMMINENCE" STANDARD FOR PRE-ENFORCEMENT STANDING CONTRADICTS INTERVENING SUPREME COURT PRECEDENT AND SHOULD BE ABANDONED.**

"For more than a decade, this circuit has offered a wary allegiance" to the rule first announced in *Navegar*, which

> bar[s] preenforcement claims for declaratory relief unless the plaintiff can show a threat of imminent prosecution, and thus den[ies] access to Article III courts to District of Columbia litigants seeking vindication of civil rights claims—access they would have under applicable Supreme Court precedent.

*Ord*, 587 F.3d at 1146 (Brown, J., dissenting in part). Though "repeatedly express[ing] grave misgivings" about its sharp tension with multiple pronouncements of the Supreme Court, *see id*. at 1149-50, this Court has reluctantly left its core holding in place.

But despite the controversy surrounding *Navegar*'s continuing viability, one thing should remain clear: its holding cannot be extended to contradict intervening statements of the Supreme Court. Because the Supreme Court has unambiguously declared that a plaintiff may challenge the constitutionality of a criminal law without being "requir[ed] . . . to expose himself to liability" in the form of prosecution,

25

*Medimmune*, 549 U.S. at 129, *Navegar*'s application here must be abandoned as doing precisely that.

**A.   Standing to Assert a Pre-Enforcement Challenge is Established Whenever a Plaintiff Foregoes Activity Based on a Credible Fear of Enforcement.**

Discussion of the federal courts' various standing doctrines can often devolve into abstractions, but it is important to recall what is essentially at stake: the right of an individual to access Article III courts for the vindication of civil rights claims. This right is to be enjoyed within the District of Columbia just as it is elsewhere in the United States. *O'Donoghue* v. *United States*, 289 U.S. 516, 540 (1933).

The Supreme Court has fashioned pre-enforcement standing guidelines that reflect a practical, common-sense approach to distinguish those claims that are merely hypothetical from those that seek to resolve actual, live "cases or controversies." U.S. CONST. art. III. Outside this Circuit, and before the Supreme Court, it is not a controversial legal principle that the government creates an actual case or controversy whenever its laws or policies cause reasonable people to forego behavior, their right to engage in which a competent court has the power to secure.

26

Notably, the Supreme Court's guidance in this area has continued in the intervening years since this Circuit's 1997 decision in *Navegar*. Just three years ago, for example, the Supreme Court declared:

> [W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced. *The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.*

*Medimmune*, 549 U.S. at 129 (emphasis added).

The Supreme Court proceeded to review its history of cases affirming the constitutionality of pre-enforcement standing, explaining,

> [i]n each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do . . . That did not preclude subject matter jurisdiction because the threat eliminating behavior was effectively coerced.

*Id*. at 129. This intervening statement by the Supreme Court is clear and unequivocal: standing exists even if "the imminent threat of prosecution" has been eliminated by the plaintiff's coerced compliance. *Id*. Indeed, "[t]he dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the

27

Declaratory Judgment Act to ameliorate.'" *Id.* (quoting *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 152 (1967)); *see also Ord*, 587 at 1150 (Brown, J., dissenting in part).

Clearly then, the appropriate inquiry cannot be made to depend upon an *imminent* threat of prosecution, but rather "a *credible* threat of prosecution." *Babbitt* v. *United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (emphasis added). This requirement of a "credible" threat plainly establishes an "injury-in-fact." "[I]njury in fact" means that "the plaintiff must have suffered . . . . an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (citations omitted).

Imminence, under *Lujan*, is merely one class of "factual" as opposed to hypothetical harm. Accordingly, with respect to the injury-in-fact element, the Supreme Court has recognized that plaintiffs may assert "a claim of specific present objective harm or a threat of specific future harm." *Laird* v. *Tatum*, 408 U.S. 1, 14 (1972); *DKT Memorial Fund Ltd.* v. *Agency for Int'l Dev.*, 887 F.2d 275, 299 (D.C. Cir. 1989).

28

The "credibility" requirement is not rigorous, and is simply meant to eliminate those cases where plaintiffs are challenging a statutory relic no prosecutor is likely to invoke. For example, the Fourth Circuit rejected the credibility of the prosecutorial threat in declining to hear a challenge to Virginia's ancient bans on fornication and cohabitation, the last recorded convictions for which had occurred in 1849 and 1883, respectively. *Doe* v. *Duling*, 782 F.2d 1202 (4th Cir. 1986); *see also Bronson* v. *Swensen*, 500 F.3d 1099 (10th Cir. 2007) (no standing to challenge polygamy laws unenforced under plaintiff's circumstances).

As a general rule, however, pre-enforcement challenges are permitted where the statutes being challenged are "not moribund." *Doe* v. *Bolton*, 410 U.S. 179, 188 (1973). As recently as 1968, the Supreme Court let a teacher challenge Arkansas' "monkey law," notwithstanding the possibility that "the statute is presently more of a curiosity than a vital fact of life." *Epperson* v. *Arkansas*, 393 U.S. 97, 102 (1968).

If anything, "[t]here may be a trend in favor of . . . a practical approach" to standing, where "courts are content with any realistic inferences that show a likelihood of prosecution." *New Hampshire Hemp*

29

*Council, Inc.* v. *Marshall*, 203 F.3d 1, 5 (1st Cir. 2000); *Maryland State*

*Conf. of NAACP Branches* v. *Maryland Dep't of State Police*, 72 F. Supp.

2d 560, 565 (D. Md. 1999) ("plaintiffs' likelihood of injury depends only

on their status as a member of a minority group and their need to travel

on I-95").

To this end, courts routinely allow challenges to statutes immediately

upon their effective date, without waiting for historical evidence of

prosecution. *See*, *e.g.*, *Reno* v. *ACLU*, 521 U.S. 844, 861 (1997)

("immediately after the President signed the statute, 20 plaintiffs filed

suit against the Attorney General of the United States and the

Department of Justice") (footnote omitted); *Carhart* v. *Gonzales*, 413

F.3d 791, 792 (8th Cir. 2005) ("[t]he day the President signed the Act

into law, plaintiffs filed suit"), *rev'd on other grounds*, 550 U.S. 124

(2007). Simply put, the government is not permitted one or several "free"

pre-enforcement prosecutions under a new law.

**B.    Requiring an "Imminent" Rather Than "Credible" Threat
of Prosecution Imposes an Improperly-Heightened
Standard for Testing a Criminal Law's Constitutionality.**

Notwithstanding the Supreme Court's clear instructions regarding

the nature of the threat necessary to sustain pre-enforcement standing,

30

this Court adopted a heightened requirement that the prosecutorial threat not only be "credible," but imminently so. *Navegar*, 103 F.3d at 1001.

*Navegar* involved a challenge by firearms manufacturers to the now-expired federal ban on "assault weapons," 18 U.S.C. § 922(v)(1). Two relevant provisions of the law were at issue: the first banned the future manufacture of certain firearms listed by name, and the second applied to firearms that possessed certain characteristics. With respect to the plaintiffs' challenge to the first category, this Court found standing to exist. *Navegar*, 103 F.3d at 999. Federal agents had visited plaintiffs on the day the law went into effect and took inventories of previously-manufactured, grandfathered weapons identified by name in the statute. *Id.* Subsequently, the government also instructed plaintiffs not to violate the new law. *Id.* That such facts establish a sufficiently credible prosecutorial threat to confer standing is uncontroversial.

But with respect to the second category of weapons (which arguably fell within the ambit of the ban), this Court held the plaintiffs were not suffering from a fear of prosecution that was sufficiently "imminent" to

31

make their claims justiciable. *Id*. at 1001. The problems with this

heightened "imminence" standard soon became apparent.

Difficulties surfaced in *Seegars* v. *Ashcroft*, 396 F.3d 1248 (D.C. Cir.

2005), a pre-enforcement challenge to Washington, D.C.'s bans on the

possession of handguns and all functional firearms. Applying *Navegar*, a

reluctant 2-1 majority held none of the plaintiffs had standing to

challenge the gun bans because none could demonstrate that they,

specifically, would be targeted for prosecution, notwithstanding the

well-known fact that virtually all violators are prosecuted.

The *Seegars* majority observed, "[w]e cannot help noting that

*Navegar*'s analysis is in sharp tension with standard rules governing

preenforcement challenges to agency regulations," *Seegars*, 396 F.3d at

1253, and that "[t]here is also tension between *Navegar* and our cases

upholding preenforcement review of First Amendment challenges to

criminal statutes." *Id*. at 1254. This Court also conceded that *Navegar*

was inconsistent with the pre-enforcement standing requirements of at

least one circuit. *Id*. at 1255 (noting conflict with *People's Rights*

*Organization* v. *City of Columbus*, 152 F.3d 522 (6th Cir. 1998)).

32

And as explained in response to a petition for rehearing en banc, "[a]s a panel we were constrained by [*Navegar*], even though, as my opinion for the court made clear, it appeared to be in conflict with an earlier Supreme Court decision [in *United Farm Workers*]." *Seegars* v. *Gonzales*, 413 F.3d 1, 2 (D.C. Cir. 2005) (Williams, Senior Circuit Judge).

Having explained that *Navegar* conflicts with Supreme Court precedent and case law from another circuit, not to mention its "sharp tension with standard rules" in other cases, *Seegars*, 396 F.3d at 1253, and "tension" with yet another set of circuit precedent, *id.* at 1254, this Court searched for a rationale to justify *Navega's* continuing viability. All that could be said in its defense was that "it represents the only circuit case dealing with a non First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings." *Id.* at 1254 (citations omitted). Among the votes for en banc review was that of the current Chief Justice.

An even more problematic application of the *Navegar* doctrine arrived with this Court's decision in *Parker*, another, ultimately more successful challenge to the same laws at issue in *Seegars*. The record of pre-

enforcement threats in *Parker* was quite stark. When the District Court inquired whether the plaintiffs would be prosecuted for violating the law, defendants' counsel rejected the District Court's suggestion that plaintiffs would get "a free ride" on account of their litigation activity, and referred to "the fact that if, in fact, they break the law and we would enforce the law that they're breaking." Appellants' Br., 04-7041 at 9. Indeed, upon the filing of the litigation, city officials ominously proclaimed to a newspaper that the plaintiffs' behavior would harm children and "is not what we want." *Id*. at 10 (citation omitted).

This Court found even these facts insufficient to create an "imminent" risk of prosecution should the law be violated. *Parker*, 478 F.3d at 375. Still, this Court was not enthusiastic about rejecting pre-enforcement standing, repeating the belief that the *Navegar* rule contradicts multiple pronouncements by the Supreme Court:

> The unqualified language of *United Farm Workers* would seem to encompass the claims raised by the *Seegars* plaintiffs, as well as the appellants here. Appellants' assertions of Article III standing also find support in the Supreme Court's decision in *Virginia* v. *American Booksellers Ass'n*, 484 U.S. 383, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988) . . . In that case, the Court held it sufficient for plaintiffs to allege "an actual and well founded fear that the law will be enforced against them," *id*. at 393, without any additional requirement that

34

the challenged statute single out particular plaintiffs by name. In both *United Farm Workers* and *American Booksellers*, the Supreme Court took a far more relaxed stance on pre enforcement challenges than *Navegar* and *Seegars* permit. Nevertheless, unless and until this court en banc overrules these recent precedents, we must be faithful to *Seegars* just as the majority in *Seegars* was faithful to *Navegar*.

*Parker*, 478 F.3d at 395 (footnote omitted).

In sum, by requiring a prospective plaintiff to be subjected to an "imminent" rather than merely "credible" threat of prosecution, the *Navegar* rule imposes an improperly-heightened standard for testing the constitutionality of a criminal law under the Declaratory Judgment Act. This "imminence" doctrine in pre-enforcement challenges has been repeatedly declared by this Court to be at odds with Supreme Court precedent and the practice in other courts, and lacks any ongoing persuasive rationale today.

## C.     As the District Court Observed, Its Application of the *Navegar* Rule to this Case Prevents Any Constitutional Challenge to the Laws at Issue Absent Exposure to Criminal Prosecution.

While the *Navegar* rule has operated in considerable tension with multiple Supreme Court pronouncements concerning the Declaratory Judgment Act, its application to deny standing in this case would be entirely irreconcilable with those precedents. This is because the

35

particular characteristics of the federal criminal laws at issue here

prevent them from *ever* drawing an "imminent" threat of prosecution

against a prospective plaintiff who is unwilling to actually expose him or

herself to criminal prosecution. As the district court explained in its

opinion below, the *Navegar* rule functions to effectively prevent

Dearth's case from ever being heard on the merits by an Article III court

outside of an actual criminal prosecution:

> Like the D.C. Circuit itself, plaintiffs have criticized the *Navegar* line
> of cases as improperly stringent in comparison with other authority.
> That criticism is especially apt in this case. Domestic firearm
> merchants are legally obligated to refuse sale to citizens who reside
> abroad. Because sales will be refused, would-be purchasers will never
> draw government attention. Because they will draw no attention,
> they will never be in a position to be threatened with prosecution. If
> *Navegar* retains its vitality, the only way the state residence law can
> be challenged in this Circuit is to engage in a forbidden transaction,
> exposing oneself to prosecution.

JA 8 (citations omitted). And because Plaintiffs do not reside within any

geographic circuit, the government seeks to move all such challenges

here, based on the location of the seat of government, and for alleged

reasons of convenience.

Clearly then, an extension of the *Navegar* rule to this case would

squarely contradict the Supreme Court's unambiguous statement that a

plaintiff is permitted to challenge the constitutionality of a criminal law

without being "requir[ed] . . . to expose himself to liability" in the form of

prosecution, *Medimmune*, 549 U.S. at129. To the extent that the

*Navegar* rule can be read to require Dearth to engage in an illegal

"forbidden transaction" and subject himself to prosecution, it must be

abandoned as incompatible with the Supreme Court's intervening

opinion in *Medimmune*.

### D. *Navegar* Cannot be Applied in a Manner Consistent with Intervening Supreme Court Precedent.

The short history of *Navegar*'s imminence doctrine is one of

progressively untenable and illogical results. Each time it reappears

before this Court, it is criticized for being in "tension" with higher

authority but warily followed as circuit precedent. But as applied to this

case, the *Navegar* rule literally contradicts *Medimmune* by actually

requiring a plaintiff to break a criminal law in order to test its

constitutionality.  Rather than attempt to meld *Navegar*'s broken

imminence mechanism into the Supreme Court's more practical, correct

inquiry into the credibility of prosecutorial threat, this Court should

follow the Supreme Court's intervening instructions in this area.

37

Doing so does not necessarily require hearing this case en banc, as suggested in *Parker*, 478 F.3d at 375 and by several current and former members of this Court on rehearing in *Seegars*, 413 F.3d at 1. Many circuits permit panels to overrule or decline to follow prior circuit precedent once it becomes clear that intervening Supreme Court authority has superseded it. For example, in the Ninth Circuit, a panel "may overrule prior circuit authority without taking the case en banc when an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point." *Miller* v. *Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (*quoting Galbraith* v. *County of Santa Clara*, 307 F.3d 1119, 1123 (9th Cir. 2002) and *United States* v. *Lancellotti*, 761 F.2d 1363, 1366 (9th Cir. 1985)).

Other circuits follow a similar approach. *See United States* v. *Burke*, 781 F.2d 1234, 1239 n.2 (7th Cir. 1985) ("A court need not blindly follow decisions that have been undercut by subsequent cases . . . .") (citations omitted); *Chisolm* v. *TranSouth Fin. Corp.*, 95 F.3d 331, 337 n.7 (4th Cir. 1996); *White* v. *Estelle*, 720 F.2d 415, 417 (5th Cir. 1983); *Dawson* v. *Scott*, 50 F.3d 884, 892 n.20 (11th Cir. 1995). Indeed, a failure to

38

recognize that intervening Supreme Court precedent rendered obsolete a circuit court decision has been grounds for summary reversal. *United States* v. *Nachtigal*, 507 U.S. 1 (1993).

The Supreme Court's decision in *Medimmune*—a higher authority clarifying that standing exists even when there is no imminent prosecutorial threat—is plainly inconsistent with the earlier-decided *Navegar* and *Seegars*. Under ordinary principles holding a higher intervening authority as overruling an earlier, lower authority, *Medimmune* should be understood as overruling those two cases. *Parker* was decided shortly after *Medimmune*, which was brought to the *Parker* panel's attention; however, *Parker* does not mention *Medimmune*, an odd circumstance considering that decision's recognition of several other Supreme Court precedents it acknowledged to be at tension with this Court's imminence doctrine. Under the circumstances, *Parker*'s clear inconsistency with *Medimmune* should render the circuit opinion non-authoritative to the extent of that inconsistency.[6]

_____

[6]The unsuccessful *Parker* plaintiffs filed a cross-petition for certiorari that was twice submitted to conference, and denied only on the last day of the Supreme Court's term, one day following the decision in *Heller*. *Parker* v. *District of Columbia*, 128 S. Ct. 2994 (2008). Of

39

### E.   *Navegar*'s Pre-Enforcement Standing Requirement of an "Imminent" Threat of Prosecution Has Proven Unworkable.

As this case demonstrates, *Navegar*'s imminence requirement has led to irrational and unjust results, effectively granting the government a pocket veto over a broad swath of pre-enforcement claims. Because the credibility of enforcement is now based not on the government's conduct, but on its communication to the putative plaintiff, a plaintiff can be deprived of pre-enforcement standing merely if the government is silent or deliberately vague about its intentions.

Moreover, Dearth's case—as the lower court recognizes—will never attract a sufficiently imminent threat under the *Navegar* rule, and thus leaves his dispute entirely unreviewable by an Article III court outside of an actual criminal prosecution. This case thus continues the unhappy experience of *Navegar* foreclosing plainly credible pre-enforcement challenges, amply demonstrating the unusual control that the

---

course, a denial of certiorari is not a pronouncement on the merits of the issue, and the question of pre-enforcement standing was not taken up by the Supreme Court in *Heller*.

40

government now has over whether its actions are reviewed in an Article III court. *See Ord*, 587 F.3d at 1152-53 (Brown, J., dissenting in part).

*Navegar* also acts as a magnet for transfer motions, incentivizing the government into taking inconsistent positions. The lower court accepted the government's contention that this is purely a pre-enforcement claim, rather than one based at least in part on an existing injury stemming from an act of administrative enforcement.[7] But the government had taken the opposite view in order to bring the case to Washington.

Had this behavior manifested itself in relation to most subjects apart from jurisdiction, the government would be judicially estopped from asserting its main argument. *See Ins. Corp. of Ir.* v. *Compagnie Des Bauxites De Guinee*, 456 U.S. 69, 701-02 (1984) (judicial estoppel inapplicable to jurisdiction). "[J]udicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New*

_____

[7]Of course, Dearth's claim has both aspects: it is a pre-enforcement claim to the extent he does not wish to be prosecuted for acquiring firearms contrary to law, the actual injury being his forbearance. But he was also literally barred from acquiring firearms during his purchase attempts.

41

*Hampshire* v. *Maine*, 532 U.S. 742, 749 (2005) (citations omitted).

Judicial estoppel "protect[s] the integrity of the judicial process . . . by

prohibiting parties from deliberately changing positions according to the

exigencies of the moment." *Id.* at 749-50 (citations omitted). The

"purpose is to prohibit litigants from playing 'fast and loose,' or 'blowing

hot and cold,' with the courts." *Donovan* v. *United States Postal Service*,

530 F. Supp. 894, 902 (D.D.C. 1981) (citations omitted).

Although not expressly binding here, the doctrine reflects an interest

in the integrity of court proceedings and is thus instructive as to

*Navegar*'s impact. In the Ohio District Court, and before the Sixth

Circuit, the government asserted that because Dearth had made his first

attempt to purchase firearms in Minnesota, the relevant events of the

case had occurred there rather than in Ohio. *See, e.g.* JA 28 ("plaintiffs'

allegations pertaining to the attempted Minnesota purchase made

Minnesota an appropriate forum choice").

The government actually went so far as to deny the existence of a pre-

enforcement issue, instead suggesting that Dearth's denied attempts to

purchase firearms constituted the only real issue in his suit:

42

Although plaintiffs sought to recharacterize their suit as a
pre-enforcement challenge based on plaintiff Dearth's apprehensions
in Ohio, the only district in which plaintiff Dearth allegedly
endeavored to buy a handgun was in Minnesota.

JA 29.

Having successfully asserted to the Ohio courts that Dearth's lawsuit

ought not be "recharacterized as a pre-enforcement challenge" because

the law had actually been tested, the government then took the exact

opposite view in the court below.

This conduct would satisfy all three prongs of the judicial estoppel

test: (1) inconsistent positions, (2) prevalence on the first inconsistent

position, and (3) unfairness. *New Hampshire*, 532 U.S. at 750-51; *Moses*

v. *Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010). The

government's two positions are plainly inconsistent. In Ohio, the

government insisted that Dearth's claim could not have been a pre-

enforcement challenge, and was based only on an actual administrative

denial. Here, the government claims Dearth suffered no administrative

denial, and his claims are entirely conjectural. The government

prevailed in its earlier contention.

43

And this is quite unfair. The government sought transfer from Ohio to Washington, D.C. to take advantage of *Navegar*, which contradicts Sixth Circuit law. *See Seegars*, 396 F.3d at 1255 (noting conflict with *People's Rights Organization*, *supra*, 152 F.3d 522).[8] It did not even bother asserting a jurisdictional challenge in Ohio. Had the Ohio courts accepted that the case has pre-enforcement aspects, the venue challenge would have failed as Dearth would have established that the Southern District of Ohio was a forum where "a substantial part of the . . . omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(2). Consequently, there would not have been a *Navegar* defense.

Regardless of whether the judicial estoppel doctrine is applicable here, the fact that *Navegar* inspires such tactics counsels against its retention.

In sum, *Navegar*'s heightened "imminence" standard has proven to be utterly unworkable and manifestly unjust to civil rights litigants. Those

---

[8]Creating nationwide venue against the federal government "was intended," in part, "to relieve the courts in the District of Columbia of some of their case load." *Pruess* v. *Udall*, 359 F.2d 615, 618 (D.C. Cir. 1965). That purpose is defeated when the government creatively seeks *Navegar*-inspired transfers.

44

litigants should not have to expose themselves to criminal prosecution to test the constitutionality of a law that directly affects their behavior. Because *Navegar*'s application to this particular case contradicts intervening statements by the Supreme Court, it can and should be abandoned here.

## IV.   THE SECOND AMENDMENT FOUNDATION HAS ORGANIZATIONAL AND REPRESENTATIONAL STANDING.

SAF is a membership organization with over 650,000 members and supporters. JA 17, ¶ 3. "The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of itself and its members." *Id*. This much suffices to establish both organizational and representational standing.

### A.      SAF Has Organizational Standing.

While "[t]here is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy," *Warth*, 422 U.S. at 511, the lower court concluded that SAF

45

lacked organizational standing, reasoning that "its voluntary act of teaching cannot plausibly be the basis for a claim of constitutional injury." JA 10. But when an organization is forced to spend resources, devoting its time and energy to dealing with certain conduct, it has standing to challenge that conduct. *See*, *e.g.*, *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982).

SAF educates, researches, and publishes about gun control and its consequences. It has to educate its members, and the public, about the government's enforcement of gun laws. When people have questions about the government's firearms policies, they turn to SAF. The government's enforcement of the challenged provisions thus directly impacts the organization. *Fair Employment Council* v. *BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); *Haitian Refugee Ctr.* v. *Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987). Accordingly, SAF has organizational standing in this case to sue on its own behalf.

### B.      SAF Has Representational Standing.

An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit.

*United Food & Commercial Workers Union Local 751* v. *Brown Group*, Inc., 517 U.S. 544, 553 (1996) (citation omitted).

In this respect, SAF's representational standing is identical to that which this Court found sufficient to sustain a pre-enforcement challenge against a gun control law in *Fraternal Order of Police* v. *United States* ("FOP"), 152 F.3d 998 (1998). In *FOP*, the only question was whether chief law enforcement officers, who were members of the FOP, could assert the rights of their employees. Answering this question in the positive, this Court found the FOP satisfied all three prongs of representational standing. Since Dearth and other SAF members have standing to challenge the law (SAF believes many of its members enjoy exercising their right to arms and right to international travel), the presence of individual plaintiffs is not strictly necessary. The issue is germane to SAF's purpose, and SAF has standing.

The district court found SAF to lack representational standing after concluding that Dearth lacked standing on his own under the *Navegar* rule. Thus, it concluded that SAF had failed to allege that any of its

47

members had standing in their own right. *See* JA 10-11. But as explained above, the district court erred in its conclusion that Dearth lacks individual standing. Accordingly, SAF has representational standing to sue on behalf of its similarly situated members.

## CONCLUSION

Dearth has established standing under two independent theories: he has been administratively denied permission to purchase firearms, and he reasonably fears a credible threat of prosecution were he to break the laws at issue here. Plaintiff-Appellant SAF has standing under well-established precedent concerning organizational and representational standing.

The judgment below should be reversed, and the case remanded for determination on the merits of Plaintiffs' constitutional claims.

Dated:   July 28, 2010          Respectfully submitted,

                                Alan Gura
                                Thomas M. Huff
                                GURA & POSSESSKY, PLLC
                                101 N. Columbus Street, Suite 405
                                Alexandria, VA 22314
                                703.835.9085/703.997.7665

                         By:   _____
                                Alan Gura

                                *Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 9,080 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Corel Wordperfect in 14-point Century Schoolbook font.

_____
Alan Gura

## CERTIFICATE OF SERVICE

I certify that on this 29th day of July, 2010, I filed the foregoing

Appellants' Brief electronically with the Clerk of the Court using the

CM/ECF System. On July 29, 2010, I served two true and correct copies

of the foregoing Appellants' Brief on the following by Federal Express:

    Anisha Dasgupta
    Appellate Staff, Civil Division
    U.S. Department of Justice
    950 Pennsylvania Avenue, N.W., Room 7533
    Washington, D.C. 20530
    (202) 514-5428

I further certify that on this, the 29th day of July, 2010, I served the

electronic copy of the foregoing Appellants' Brief on above-listed counsel

by email to anisha.dasgupta@usdoj.gov

    The brief was also filed this day by dispatch to the Clerk via Federal

Express.

    I declare under penalty of perjury that the foregoing is true and

correct.

    Executed this the 29th day of July, 2010.

                        _____
                        Alan Gura
                        Counsel for Plaintiffs-Appellants