[ORAL ARGUMENT NOT YET SCHEDULED]

No. 10-5062

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

MAXWELL HODGKINS et al.,

Plaintiffs-Appellants,

v.

ERIC H. HOLDER, JR., Attorney General of the United States,

Defendant-Appellee.
_____

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
_____

BRIEF FOR APPELLEE
_____

TONY WEST
  Assistant Attorney General

RONALD C. MACHEN, JR.
  United States Attorney

MARK B. STERN
  (202) 514-5089
MICHAEL S. RAAB
  (202) 514-4053
ANISHA S. DASGUPTA
  (202) 514-5428
  Attorneys, Appellate Staff
  Civil Division, Room 7533
  U.S. Department of Justice
  950 Pennsylvania Ave, NW
  Washington, D.C. 20530-0001

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel hereby certifies as follows:

A. <u>Parties and Amici</u>.

The plaintiffs-appellants are Maxwell Hodgkins, Stephen Dearth, and the Second Amendment Foundation. The defendant-appellee is Eric Holder, Jr., Attorney General of the United States. There have been no amici curiae.

B. <u>Rulings Under Review</u>.

The ruling under review is a Memorandum Opinion and Order (per Hon. James Robertson), dated January 5, 2010. <u>Hodgkins v. Holder</u>, 677 F. Supp. 2d 202 (D.D.C. 2010). <u>See</u> Joint Appendix 3-11.

C. <u>Related Cases</u>.

This case has not previously been before any court other than the district court. Plaintiffs have brought similar suits in the Southern District of Ohio, <u>Dearth v. Gonzales</u>, No. 06-1012, 2007 WL 1100426 (S.D. Ohio Apr. 10, 2007) (dismissing suit for lack of venue), <u>appeal dismissed sub. nom.</u> <u>Dearth v. Mukasey</u>, 516 F.3d 413 (6th Cir. 2008); and the Northern District of Texas, <u>Hodgkins v. Gonzales</u>, No. 06-2114 (N.D. Tex. Aug. 15, 2007) (dismissing suit for lack of venue), <u>appeal dismissed sub. nom.</u> <u>Hodgkins v. Mukasey</u>, 271 Fed. Appx. (5th Cir. 2008).

Respectfully submitted,

/s/ Anisha S. Dasgupta
ANISHA S. DASGUPTA
Attorney for Appellee

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

GLOSSARY

STATEMENT OF JURISDICTION ...................................... 1

STATUTES AND REGULATIONS ....................................... 1

QUESTION PRESENTED ............................................. 2

STATEMENT OF THE CASE .......................................... 2

    A.   Statutory and Regulatory Background .................. 2

    B.   Facts and Prior Proceedings. ....................... 10

SUMMARY OF ARGUMENT ........................................... 12

STANDARD OF REVIEW ............................................ 15

ARGUMENT ...................................................... 15

    The District Court Properly Dismissed Plaintiffs' Claims
    For Lack Of Standing. .................................. 15

    A.   Plaintiffs Have Not Established A Sufficient
       Threat Of Prosecution. ............................ 16

    B.   Plaintiffs Have Not Established Any Other Injury
       Sufficient To Support Article III Standing. ........ 22

       1.   Dearth Has Not Established Any
          Injury-In-Fact. ............................... 22

       2.   No Injury-In-Fact Has Been Established
          By The Second Amendment Foundation. .......... 27

    C.   Because Plaintiffs Have Failed To Establish
       Any Injury Sufficient To Support Article III
       Standing, Their Suit Must Be Dismissed. ............ 30

CONCLUSION ................................................... 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

<u>Page</u>

Cases:

<u>Abigail Alliance For Better Access to Developmental</u>
<u>Drugs v. Eschenbach</u>, 469 F.3d 129 (D.C. Cir. 2006)... 29, 30

<u>Adarand Constructors, Inc. v. Pena</u>,
515 U.S. 200 (1995) ................................. 22, 24

<u>American Civil Liberties Union v. Reno</u>,
929 F. Supp. 824 (E.D. Pa. 1996) ....................... 20

<u>American Library Association v. Barr</u>,
956 F.2d 1178 (D.C. Cir. 1992) ......................... 18

* <u>Babbitt v. United Farm Workers</u>,
442 U.S. 289 (1979) ........................ 16, 18, 19, 20

<u>Bach v. Pataki</u>,
408 F.3d 75 (2d Cir. 2005) ............................. 25

<u>Berger v. Board of Psychologist Examiners</u>,
521 F.2d 1056 (D.C. Cir. 1975) ......................... 25

<u>Carney v. American University</u>,
151 F.3d 1090 (D.C. Cir. 1998) ......................... 15

<u>Cassell v. Federal Communication Commission</u>,
154 F.3d 478 (D.C. Cir. 1998) .......................... 25

<u>Center for Law and Education v. Department of Education</u>,
396 F.3d 1152 (D.C. Cir. 2005) ......................... 15

<u>City of Bedford v. FERC</u>,
718 F.2d 1164 (1983) ................................... 25

<u>District Intown Properties Ltd. v. District of Columbia</u>,
198 F.3d 874 (1999) .................................... 25

_____

* Authorities chiefly relied upon are marked with an asterisk.

iii

<u>City of Los Angeles v. Lyons</u>, 461 U.S. 95 (1983) .......... 22

<u>District of Columbia v. Heller</u>,
    128 S. Ct. 2783 (2008) ............................. 2, 25

<u>Epperson v. Arkansas</u>, 393 U.S. 97 (1968) .............. 20, 21

<u>Fair Employment Council of Greater Washington, Inc. v.
    BMC Marketing Corp</u>, 28 F.3d 1268 (D.C. Cir. 1994) ...... 29

<u>Golden v. Zwickler</u>, 394 U.S. 103 (1969) .............. 22, 23

<u>Gonzales v. Carhart</u>,550 U.S. 124 (2007) ................... 20

<u>Grid Radio v. Federal Communication Commission</u>,
    278 F.3d 1314 (D.C. Cir. 2002) ......................... 25

<u>Gun South, Inc. v. Brady</u>, 877 F.2d 858 (11th Cir. 1989) .... 7

*  <u>Haase v. Sessions</u>,
    835 F.2d 902 (D.C. Cir. 1987) .................. 22, 23, 24

   <u>Havens Realty Corp. v. Coleman</u>,
    455 U.S. 363 (1982) ............................... 27, 28

*  <u>Lujan v. Defenders of Wildlife</u>,
    504 U.S. 555 (1992) .................... 16, 22, 23, 24, 26

*  <u>Medimmune, Inc. v. Genentech, Inc.</u>,
    549 U.S. 118 (2007) ........................ 16, 17, 31, 32

   <u>National Taxpayers Union, Inc. v. United States</u>,
    68 F.3d 1428 (D.C. Cir. 1995) ........................ 27

*  <u>National Treasury Employees Union v. United States</u>,
    101 F.3d 1423 (D.C. Cir. 1996) ................ 27, 28, 29

   <u>National Rifle Association v. Brady</u>,
    914 F.2d 475 (4th Cir. 1990) ........................... 6

*  <u>Navegar, Inc. v. United States</u>,
    103 F.3d 994 (D.C. Cir. 1997) .......... 16, 17, 18, 21, 32

iv

Navegar, Inc. v. United States,
    192 F.3d 1050 (D.C. Cir. 1999) ..................... 2, 3, 4

New Hampshire Hemp Council, Inc. v. Marshall,
    203 F.3d 1 (1st Cir. 2000) ............................. 20

O'Shea v. Littleton, 414 U.S. 488 (1974) ................. 22

* Ord v. District of Columbia,
    587 F.3d 1136 (D.C. Cir. 2009) ............... 16, 17, 31, 32

* Parker v. District of Columbia,
    478 F.3d 370 (D.C. Cir. 2007) ..................... 25, 26

Poe v. Ullman, 367 U.S. 497 (1961) ....................... 17

*  Seegars v. Gonzales,
    396 F.3d 1248 (D.C. Cir. 2005) ............. 16, 17, 18, 31

Spann v. Colonial Village, Inc.,
    899 F.2d 24 (D.C. Cir. 1990) ...................... 28, 29

Wilkett v. I.C.C.,
    710 F.2d 861 (D.C. Cir. 1983) ......................... 25


**Statutes:**

Gun Control Act of 1968,
    Pub. L. No. 90-618, 82 Stat. 1213 ..................... 3

Omnibus Crime Control and Safe Streets Act of 1968,
    Pub. L. No. 90-351, 82 Stat. 197 ...................... 3

Violent Crime Control and Law Enforcement Act of 1994,
    Pub. L. No. 103-322, 108 Stat 2019 .................... 6

18 U.S.C. § 922(a)(5) ............................... 4, 6, 7

18 U.S.C. § 922(a)(6) ................................... 6

18 U.S.C. § 922(a)(9) .................. 2, 6, 7, 10, 12, 15

18 U.S.C. § 922(b)(3) .................. 2, 4, 5, 7, 12, 15

v

18 U.S.C. § 925(d) ....................................... 26

18 U.S.C. § 926(a) ....................................... 6

28 U.S.C. § 1291 ......................................... 1

28 U.S.C. § 1331 ......................................... 1

**Regulations:**

27 C.F.R. § 478.11 ....................................... 8

27 C.F.R. § 478.29a ................................... 2, 10

27 C.F.R. § 478.96 ............................... 2, 7, 10, 12

27 C.F.R. § 478.99 ................................... 2, 18

27 C.F.R. § 478.124 ............................... 2, 10, 12

27 C.F.R. § 478.124(a) .............................. 7, 25

27 C.F.R. § 478.124(c)(1) ............................. 7, 8

27 C.F.R. § 478.124(d) ................................... 8

27 C.F.R. § 478.124(e) ................................... 8

**Legislative Materials:**

137 Cong. Rec. S1369-01 (Jan. 31, 1991) ................. 5

H. Rep. No. 90-1577 (1968) .............................. 4

S. Rep. No. 90-1097 (1968) ........................... 4, 5

**Miscellaneous:**

Bureau of Alcohol, Tobacco, and Firearms,
  Federal Firearms Regulations Reference Guide (2005) ..... 9

Fed. R. App. P. 4(a)(1)(B) .............................. 1

vi

## **GLOSSARY**

J.A.        Joint Appendix

ATF        Bureau of Alcohol, Tobacco, Firearms and Explosives

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

No. 10-5062

———————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

MAXWELL HODGKINS et al.,

Plaintiffs-Appellants,

v.

ERIC H. HOLDER, JR., Attorney General of the United States,

Defendant-Appellee.

———————————————

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————————————————

BRIEF FOR APPELLEE

———————————————

**STATEMENT OF JURISDICTION**

Plaintiffs invoked the district court's jurisdiction pursuant to 28 U.S.C. § 1331.  Joint Appendix ("J.A.") 14.  On January 5, 2010, the district court entered a final order granting defendant's motion to dismiss.  Id. at 3.  Plaintiffs filed a timely notice of appeal on March 3, 2010.  See id. at 2; Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

**STATUTES AND REGULATIONS**

Pertinent regulations are reproduced in the addendum to this brief.

## QUESTION PRESENTED

Whether the district court correctly dismissed plaintiffs' suit for lack of standing.

## STATEMENT OF THE CASE

This is an action for declaratory relief filed by plaintiffs Stephen Dearth, Maxwell Hodgkins, and the Second Amendment Foundation, Inc. Plaintiffs bring a pre-enforcement challenge the constitutionality of federal criminal statutes restricting purchases of firearms by individuals who live outside the seller's state of residence, 18 U.S.C. § 922(a)(9), (b)(3), and to federal regulations implementing those statutory provisions, 27 C.F.R. §§ 478.29a, 478.96, 478.99, 478.124. See J.A. 18-22. The district court dismissed plaintiffs' suit for lack of standing. Id. at 3. Plaintiffs then filed this timely appeal.

A.  Statutory and Regulatory Background.

1.  Congress has authority to "impos[e] conditions and qualifications on the commercial sale of arms," District of Columbia v. Heller, 128 S. Ct. 2783, 2817 (2008), as part of its regulation of interstate commerce in firearms. See generally Navegar, Inc. v. United States, 192 F.3d 1050, 1057-64 (D.C. Cir. 1999). These laws reflect "the widely accepted knowledge that there is a vast interstate market in firearms that makes the states unable to control the flow of firearms across their borders or to prevent the crime inevitably attendant to the possession of such

2

weapons once inside their borders." Id. at 1063.

Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968 ("Omnibus Crime Control Act"), Pub. L. No. 90-351, 82 Stat. 197, in light of its finding that "'there is a widespread traffic in firearms moving in or otherwise affecting interstate commerce, and the existing Federal controls over such traffic do not adequately enable the states to control this traffic within their own borders through the exercise of their police power.'" Navegar, 192 F.3d at 1062 (quoting Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. at 225 (ellipsis omitted)). "Congress further found that 'the ease with which any person can acquire firearms[] is a significant factor in the prevalence of lawlessness and violent crime in the United States.'" Id. at 1062-63 (quoting Pub. L. No. 90-351, Title IV, § 901(a)(2), 82 Stat. at 225 (ellipsis omitted)). Congress concluded that "only through adequate Federal control over interstate and foreign commerce in these weapons[] . . . can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." Pub. L. No. 90-351, Title IV, § 901(a)(3), 82 Stat. at 225.

Similarly, Congress's "'principal purpose'" in enacting the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, was "'to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to

regulate firearms traffic within their borders.'"  <u>Navegar</u>, 192

F.3d at 1063 (quoting H.R. Rep. No. 90-1577, at 6 (1968)).

To that end, Congress included, in both the Omnibus Crime

Control Act and the Gun Control Act, statutory provisions "designed

to prevent the avoidance of state and local laws controlling

firearms by the simple expediency of crossing a State line to

purchase one." H. Rep. No. 90-1577, at 15 (1968); <u>see also</u> S. Rep.

No. 90-1097, at 114 (1968).  These provisions include 18 U.S.C.

§ 922(a)(5), which generally restricts firearm transfers to persons

"who the transferor knows or has reasonable cause to believe does

not reside in . . . the State in which the transferor resides,"[1]

and 18 U.S.C. § 922(b)(3), which restricts the sale of firearms by

a federally licensed seller "to any person who the licensee knows

or has reasonable cause to believe does not reside in . . . the

State in which the licensee's place of business is located."[2]

---

[1] Section 922(a)(5) makes it unlawful for any person other
than a federally-licensed importer, manufacturer, dealer, or
collector "to transfer, sell, trade, give, transport, or deliver
any firearm to any person (other than a licensed importer, licensed
manufacturer, licensed dealer, or licensed collector) who the
transferor knows or has reasonable cause to believe does not reside
in . . . the State in which the transferor resides."  This
prohibition does not apply to bequests made to an individual "who
is permitted to acquire or possess a firearm under the laws of the
State of his residence," <u>id.</u> § 922(a)(5)(A), or to "the loan or
rental of a firearm to any person for temporary use for lawful
sporting purposes," <u>id.</u> § 922(a)(5)(B).

[2] Section 922(b)(3) makes it unlawful for any federally-
licensed importer, manufacturer, dealer, or collector "to sell or
deliver . . . any firearm to any person who the licensee knows or
has reasonable cause to believe does not reside in . . . the State

As Congress noted, "interstate, nonresident purchases of firearms" pose serious challenges to "the laws of our States and their political subdivisions."  S. Rep. No. 90-1097, at 77; see also ibid. (noting testimony by "[t]he prosecuting attorney of Wayne County, Mich., which includes the city of Detroit," that "90 out of every 100 crime guns confiscated in Detroit are not purchased and registered in Michigan and that the prime source of these crime guns is by purchases [in] neighboring Ohio, where controls on firearms are minimal"); ibid. (citing testimony from "Massachusetts authorities . . . that 87 percent of the 4,506 crime guns misused in that State were purchased outside of Massachusetts in neighboring states").

Subsequently, Congress identified the emergence of a "law enforcement problem posed by aliens legally in the United States, but not residing in any State, who acquire firearms from Federal firearms licensees by utilizing an intermediary."  137 Cong. Rec. S1369-01, at S1449 (Jan. 31, 1991).  These aliens could obtain firearms from unlicensed persons by making false statements about

---

in which the licensee's place of business is located."  This prohibition "[does] not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes."  Id. § 922(b)(3)(B).  It also "[does] not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States."  Id. § 922(b)(3)(A).

5

their residence, and faced no legal penalty because Section 922
prohibits the making of false statements to licensed dealers, 18
U.S.C. § 922(a)(6), but contains no analogous prohibition on the
making of false statements to non-licensees. <u>See</u> 137 Cong. Rec. at
S1450 (noting that such acquisitions "[did] not violate any
specific portion of the [Gun Control] Act"); <u>cf.</u> 18 U.S.C.
§ 922(a)(5) (prohibiting unlicensed individuals from transferring
firearms to any person whom "the transferor <u>knows or has reasonable
cause to believe</u> does not reside in . . . the State in which the
transferor resides" (emphasis added)).

Accordingly, Congress enacted a prohibition on sales to those
without a residence in the United States, but directed this
prohibition at the recipient instead of the seller. <u>See</u> Violent
Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322,
§ 110514, 108 Stat 2019 (codified at 18 U.S.C. § 922(a)(9)). The
prohibition makes it unlawful "for any person, other than a
licensed importer, licensed manufacturer, licensed dealer, or
licensed collector, who does not reside in any State to receive any
firearms unless such receipt is for lawful sporting purposes." 18
U.S.C. § 922(a)(9).

2. The Bureau of Alcohol, Tobacco, Firearms and Explosives
(ATF) is authorized to issue "such rules and regulations as are
necessary to carry out" title 18's provisions relating to firearms.
18 U.S.C. § 926(a); <u>National Rifle Ass'n v. Brady</u>, 914 F.2d 475,

477 (4th Cir. 1990) ("The Secretary of the Treasury was authorized to promulgate regulations to facilitate the enforcement of the Gun Control Act" and "[t]his responsibility was delegated within the Department of the Treasury to the Bureau of Alcohol, Tobacco and Firearms."); see also Gun South, Inc. v. Brady, 877 F.2d 858, 861 & n.1 (11th Cir. 1989) (same).

Accordingly, ATF has promulgated regulations to implement these provisions, which include Congress's restrictions on interstate, nonresident purchases of firearms, e.g., 18 U.S.C. § 922(a)(5) and (9), (b)(3). ATF has provided that federally licensed importers, manufacturers, and dealers of firearms "shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any [unlicensed transferee] unless the licensee records the transaction on a firearms transaction record, Form 4473." 27 C.F.R. § 478.124(a); see also 27 C.F.R. § 478.96 (imposing same restrictions with respect to mail order sales). The Form 4473 establishes the transferee's identity as well as his or her eligibility to possess a firearm by documenting "the transferee's name, sex, residence address," "date and place of birth," "height, weight and race," "country of citizenship," "State of residence," and the transferee's certification that he or she "is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce." 27 C.F.R.

7

§ 478.124(c)(1) (emphasis added).[3]

ATF has also promulgated regulations defining an individual's "State of residence," which provide that "[a]n individual resides in a State if he or she is present in a State with the intention of making a home in that State." 27 C.F.R. § 478.11. In order for a State to qualify as an individual's "State of residence," the individual must have the intention of making a home in the State. E.g., ibid. (explaining that an alien who "travels on vacation or on a business trip to State X [,] [r]egardless of the length of time [he or she] spends in State X, . . . does not have a State of residence in State X . . . because [he or she] does not have a home in State X"; and explaining that a person who "maintains a home in State X" and "travels to State Y on a hunting, fishing, business, or other type of trip . . . does not become a resident of State Y by reason of such trip").

Individuals who reside in different homes during different parts of the year may have more than one State of residence. Ibid. (explaining, with respect to a U.S. citizen who "maintains a home

---

[3] See also 27 C.F.R. § 478.124(d) (requiring completion of a Form 4473 prior to "an over-the-counter transfer of a shotgun or rifle . . . to a nonlicensee who is not a resident of the State in which the licensee's business premises is located"); id. § 478.124(e) (same, with respect to "transfer of a firearm to any nonlicensee who is not a resident of the State in which the licensee's business premises is located, . . . [but] is acquiring the firearm by loan or rental from the licensee for temporary use for lawful sporting purposes"); id. § 478.124(c) (same, for an "over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located").

in State X and a home in State Y," that "[d]uring the time that [such a person] actually resides in State X, [he or she] is a resident of State X, and during the time that [he or she] actually resides in State Y, [he or she] is a resident of State Y").

Applying these regulations, ATF has concluded that "out-of-State college student[s] may establish residence in a State by residing and maintaining a home in a college dormitory or in a location off-campus during the school term," and that "during the time the students actually reside in a college dormitory or at an off-campus location they are considered residents of the State where the dormitory or off-campus home is located."  ATF Rul. 80-21, Federal Firearms Regulations Reference Guide 126-27 (2005).[4] By analogy, a U.S. citizen whose primary residence is overseas "may establish residence in a State by residing and maintaining a home" there, such that, "[d]uring the time the [citizen] actually reside[s]" in the home, he or she would be "considered [a] resident[] of the State where the . . . home is located."  Ibid. ATF has concluded that "U.S. citizens who reside outside of the United States are not residents of a State while so residing."  ATF Rul. 81-3, Federal Firearms Regulations Reference Guide 127.

---

[4] Available at http://www.atf.gov/publications/download/p/atf-p-5300-4.pdf

9

B.  **Facts and Prior Proceedings.**

1.  This is an action for declaratory relief filed by plaintiffs Stephen Dearth, Maxwell Hodgkins, and the Second Amendment Foundation, Inc., "on behalf of itself and its members."[5] J.A. 14.  The complaint challenges the constitutionality of federal statutes restricting non-resident purchases of firearms, 18 U.S.C. § 922(a)(9), (b)(3), and ATF regulations implementing those statutory provisions, 27 C.F.R. §§ 478.29a, 478.96, 478.99, 478.124.  See J.A. 18-22.

The complaint alleges that Dearth, a U.S. citizen who resides in Canada and "does not currently maintain a residence within the United States," id. at 14, "has many friends and relatives" in the United States "whom he enjoys visiting, and whom he intends to continue visiting on a regular basis," id. at 15.  The complaint further alleges that Dearth "intends to purchase firearms within the United States, . . . which he would access for . . . purposes[] including self-defense, while visiting the United States."  Ibid.

According to the complaint, Dearth sought to purchase firearms within the United States in January 2006 and June 2007, but "the transaction could not proceed" after Dearth "truthfully advised the seller that he did not reside in any state."  Id. at 18.  The complaint claims that Dearth "reasonably fears arrest, prosecution, incarceration and/or fine if he were to provide false state

---

[5] Hodgkins is not a party to this appeal.  On July 22, 2010, this Court granted Hodgkins' motion for voluntary dismissal of his case.

residence information on a Form 4473 in order to purchase a firearm, and cannot make a retail purchase of a firearm if he truthfully declines to provide a state of residence on a Form 4473." Id. at 18.

The complaint states that the Second Amendment Foundation is "a non-profit membership organization" whose "purposes . . . include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control." Id. at 14.

2.  The district court dismissed the complaint for lack of subject matter jurisdiction, holding that plaintiffs lacked standing to bring this declaratory judgment action. Id. at 3. The court concluded that Dearth had not established "a specific live grievance" because his allegations failed to show an "immediate and real" threat of future prosecution. Id. at 5 (internal quotation marks omitted); see also id. at 6-8. The court also determined that the Second Amendment Foundation's alleged "voluntary act of teaching" was insufficient to establish the Foundation's standing to sue on its own behalf, and that the Foundation lacked standing to sue on behalf of its members "because it has failed to allege that it has any members who are U.S. citizens residing abroad who intend to purchase firearms domestically in violation of the laws at issue." Id. at 10-11.

## SUMMARY OF ARGUMENT

The district court properly dismissed this pre-enforcement challenge to two provisions of the Gun Control Act, 18 U.S.C. §§ 922(a)(9) and (b)(3), and ATF's implementing regulations. Section 922(b)(3) restricts the sale of firearms by a federally licensed seller to a person who resides outside the state where the seller is located. Section 922(a)(9) makes it unlawful for a person to receive firearms from an out-of-state source unless the firearm is for lawful sporting purposes. Regulations implementing these provisions prohibit federally licensed sellers from transferring a firearm without recording the transaction on a standard form that requires documentation of the recipient's state of residence. See 27 C.F.R. §§ 478.96, 478.124.

As the district court correctly concluded, plaintiffs have not demonstrated any actual or imminent injury resulting from the restrictions they challenge and, therefore, lack Article III standing to sue. To challenge a criminal statute prior to a prosecution, a plaintiff need not be on the brink of a violation. Rather, when a plaintiff seeks to engage in conduct that is proscribed by a statute, but arguably protected by the Constitution, the plaintiff can establish standing by showing a threat of enforcement that is sufficiently concrete to force the plaintiff's abandonment of the proposed conduct. In such circumstances, the plaintiff's coerced compliance with the statute is the injury-in-fact that gives the plaintiff standing to sue.

12

Here, plaintiffs have failed to establish a threat of prosecution sufficient to create an injury-in-fact because they have not demonstrated any present or imminent intention to engage in conduct that would expose them to the challenged restrictions. Plaintiff Stephen Dearth, a U.S. citizen residing outside the United States, is not presently exposed to federal restrictions on the sale of firearms within the United States because he is not currently in the country. And the complaint makes no showing that Dearth has any immediate and concrete plans to return to the United States. Dearth's stated intention to return at some unidentified point in the future lacks the specificity that the Supreme Court and this Court have found necessary to support pre-enforcement standing, and, indeed, broadly resembles the claims that courts have found too hypothetical and conjectural to support adjudication.

For these reasons, Dearth has also failed to establish an injury-in-fact independent of the threat of prosecution. Because Dearth is not currently in the United States, the challenged restrictions are not causing him any present injury. And because he has not stated any immediate plans to return, he is not in a position to suffer any imminent injury as a result of the challenged restrictions. Plaintiffs are mistaken in characterizing Dearth's inability to purchase firearms in 2006 and 2007 as an "administrative denial" that gives Dearth standing to bring this suit. There is no allegation that these episodes involved the

13

denial of any application by a governmental body or, in fact, that plaintiffs would have submitted any such application absent the restrictions that they challenge.

Plaintiffs' complaint does not identify any actions that the Second Amendment Foundation has been required to undertake because of the challenged statutes, and the Foundation cannot establish standing to sue on its own behalf merely on the basis of an alleged conflict between its mission and the restrictions that it challenges. The complaint is also devoid of any demonstration that the Foundation's members have been affected by the challenged restrictions. As the district court observed, the Foundation has made no showing that its membership includes any U.S. citizens residing abroad who would seek to purchase firearms domestically if not for the provisions at issue.

The district court correctly concluded that, under this Court's decisions, plaintiffs' failure to establish that they have been singled out for prosecution defeats their attempt to establish standing on the basis of a prospective threat of enforcement. Plaintiffs attack this Court's precedents on the ground that a plaintiff is not required to violate a criminal law in order to test its constitutionality. But this Court's decisions are fully consistent with that principle and have allowed pre-enforcement suits where the plaintiff is complying with the challenged statute. Plaintiffs' attack on this Court's precedents is, in any event, beside the point; their challenge fails for more fundamental

14

reasons than their inability to show specific threats of enforcement amounting to an imminent threat of prosecution. As explained above, plaintiffs have failed to establish a threat of prosecution sufficient to create an injury-in-fact because they have failed to demonstrate a concrete intention to engage in conduct that would expose them to the challenged provisions. The district court therefore properly dismissed this suit.

## STANDARD OF REVIEW

"This Court reviews de novo a dismissal for lack of standing" and in so doing "accept[s] as true all facts alleged by the nonmoving party[.]" Center for Law and Education v. Department of Education, 396 F.3d 1152, 1156 (D.C. Cir. 2005). The Court may affirm the district court's judgment on any basis supported by the record. Carney v. American University, 151 F.3d 1090, 1096 (D.C. Cir. 1998).

## ARGUMENT

**The District Court Properly Dismissed Plaintiffs' Claims For Lack Of Standing.**

Plaintiffs, who have not been prosecuted or threatened with prosecution under 18 U.S.C. §§ 922(a)(9) and (b)(3), and have not alleged any concrete intention to bring themselves within the ambit of those provisions, challenge the constitutionality of these statutes. The district court therefore properly concluded that they lack standing to sue.

15

**A.    Plaintiffs Have Not Established A Sufficient Threat Of Prosecution.**

1.  Article III's case or controversy requirement permits pre-enforcement challenges "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by a statute" as to which "there exists a credible threat of prosecution." Babbitt v. United Farm Workers, 442 U.S. 289, 298 (1979).  In those circumstances, "it is the threat of prosecution which creates the injury in fact required under standing doctrine." Ord v. District of Columbia, 587 F.3d 1136, 1143 (D.C. Cir. 2009) (quoting Navegar, Inc. v. United States, 103 F.3d 994, 1001 (D.C. Cir. 1997) (ellipsis, brackets, and quotation marks omitted)); see also Medimmune, Inc. v. Genentech, Inc., 549 U.S. 118, 129 (2007) (same).

In order to satisfy the case-or-controversy requirement of Article III, the threat of enforcement must be sufficiently concrete to establish an injury that is "'actual or imminent'" rather than "'conjectural or hypothetical.'" Ord, 587 F.3d at 1140 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); see also Seegars v. Gonzales, 396 F.3d 1248, 1252 (D.C. Cir. 2005). A "speculative" threat of prosecution is not enough. Babbitt, 442 U.S. at 298; Seegars, 396 F.3d at 1252.  The controversy must be "of sufficient immediacy and reality" to avoid "an opinion advising what the law would be upon a hypothetical state of facts."

16

Medimmune, 549 U.S. at 127 (2007) (quotation marks omitted).

The same is true when a criminal statute is challenged on the basis that the statute "deter[s] others from maintaining profitable or advantageous relations with the complainant[]." Poe v. Ullman, 367 U.S. 497, 508 (1961). "[T]he deterrent effect" must be "grounded in a realistic fear of prosecution." Ibid.

2. As the district court correctly concluded, this is not a case in which "a genuine threat of enforcement has given rise to the requisite 'injury in fact' and thus given [plaintiffs] standing." Navegar, 103 F.3d at 1001.

"The question of whether a threat of prosecution adequate to satisfy the requirements of justiciability is present in any particular pre-enforcement challenge is a factual and case-specific one." Id. at 999. "Actual threats of arrest made against a specific plaintiff are generally enough to support standing as long as circumstances haven't dramatically changed." Seegars, 396 F.3d at 1252; see also Ord, 587 F.3d at 1141-42 (allowing a pre-enforcement challenge by a plaintiff alleging the existence of a "previous warrant for his arrest" that was quashed only "to prevent judicial review of his claimed exemption" from the statute he was challenging). Actions "singl[ing] out" a plaintiff as an "intended target[]" are also generally sufficient to support justiciability. Navegar, 103 F.3d at 1000 (allowing firearms manufacturers to bring

17

a pre-enforcement challenge to provisions of a statute "prohibiting weapons that only [they] make").

Plaintiffs' complaint contains no such allegations. Indeed, to the extent that the complaint alleges a fear of enforcement, this fear is purely speculative, and is moreover based on a concern about the consequences that would ensue "if [Dearth] were to provide false state residence information on a Form 4473 in order to purchase a firearm." J.A. 18. That allegation fails to satisfy even the first requirement for a pre-enforcement challenge –– that the threatened prosecution relate to "conduct arguably affected with a constitutional interest."[6] Babbitt, 442 U.S. at 298; accord Seegars, 396 F.3d at 1254-55; see also American Library Ass'n v. Barr, 956 F.2d 1178, 1193 (D.C. Cir. 1992) (rejecting a pre-enforcement challenge by plaintiffs who "could not contend that their speech would be arguably affected with a constitutional interest" (internal quotation marks omitted)).

Plaintiffs' remaining allegations fail to establish any other "credible threat," Babbitt, 442 U.S. at 298. Dearth alleges only that he enjoys visiting friends and relatives in the United States,

---

[6] In Babbitt, the statute being challenged prohibited "'dishonest statements'" but arguably reached "even inadvertent misstatements," which were to "be tolerated to avoid the suppression of 'speech that matters.'" See American Library Ass'n v. Barr, 956 F.2d 1178, 1193 (D.C. Cir. 1992). Here, plaintiffs have not alleged that any false statements Dearth might make on the Form 4473 are connected with any protected speech. See J.A. 18.

18

"intends to continue visiting on a regular basis," and "intends to purchase firearms within the United States." J.A. 15. The complaint is silent as to when, but-for the challenged restrictions, Dearth would seek to carry out this intention.

Plaintiffs' circumstances here are therefore readily distinguishable from those that the Supreme Court, in <u>Babbitt</u>, found suggestive of a "credible threat." <u>See</u> 442 U.S. at 298. In <u>Babbitt</u>, the plaintiffs established their standing to challenge Arizona's procedures for the selection of bargaining representatives by demonstrating that they had "participated in nearly 400 elections in California under procedures thought to be amenable to prompt and fair elections," and that they stood ready engage in similar activities in Arizona but for the challenged procedures. <u>Id.</u> at 300. Similarly, the plaintiffs in <u>Babbitt</u> established standing to challenge Arizona's restrictions on consumer publicity campaigns by demonstrating their present intent to engage in such campaigns. <u>Id.</u> at 301, 303. But they could not establish the justiciability of their challenge to statutory provisions allowing them to be refused access to employer facilities. The Court, though accepting that union representatives "will inevitably seek access to employers' property," found it "conjectural to anticipate that access will be denied," and a matter of further conjecture that "access will be denied to places fitting [the plaintiffs'] constitutional claim." <u>Id.</u> at 304.

19

Because the Court could "only hypothesize" that the circumstances alleged by plaintiffs "will come to pass," any ruling on the challenged provision "would be patently advisory." <u>Ibid.</u>

Here, Dearth has not alleged a present intention to engage in conduct proscribed by the challenged restrictions -- nor could he, in light of the fact that he is not presently within the United States.[7] He has also failed to establish any intention to purchase firearms within any specified time-frame in any specified location. His allegations amount to nothing more than the statement of an intention to obtain a firearm from an unknown dealer, in an unidentified State, at some indeterminate time in the future. These allegations lack the specificity required by the Court in <u>Babbitt</u> and, indeed, broadly resemble the claims that the Court found too hypothetical and "conjectural" to support adjudication.

Plaintiffs' reliance on <u>Epperson v. Arkansas</u>, 393 U.S. 97

---

[7] Thus, plaintiffs are misguided in their reliance on pre-enforcement challenges grounded in a present intention to engage in conduct that would violate the law. <u>See</u> Appellant Br. 30 (citing <u>New Hampshire Hemp Council, Inc. v. Marshall</u>, 203 F.3d 1, 5 (1st Cir. 2000) (finding that the "threat of federal prosecution" was "realistic" where the plaintiff, "a farmer[,] . . . proposes to grow cannabis sativa plants . . . if permitted to do so"); <u>Gonzales v. Carhart</u>, 550 U.S. 124, 132 (2007) (allowing a pre-enforcement challenge to "a federal statute regulating abortion procedures" by "doctors who perform second-trimester abortions"); <u>American Civil Liberties Union v. Reno</u>, 929 F. Supp. 824, 829 & 839 n.9 (E.D. Pa. 1996) (allowing a pre-enforcement challenge to a statute prohibiting the interstate transmission to a minor of "any comment, request, suggestion, proposal, image or other communication which is obscene or indecent" by plaintiffs who alleged wide-ranging present effects on their speech), <u>aff'd</u>, 521 U.S. 844 (1997)).

(1968), is equally misplaced.  See Appellant Br. 29.  In that case, the Court permitted a public school teacher to bring a pre-enforcement challenge to the constitutionality of an Arkansas statute prohibiting the teaching of evolution in state-supported schools.  The Court explained that the local school board had "adopted and prescribed a textbook which contained a chapter" discussing the theory of evolution and that the teacher therefore "faced at least a literal dilemma because she was supposed to use the new textbook for classroom instruction and presumably to teach the statutorily condemned chapter[,] but to do so would be a criminal offense and subject her to dismissal."  393 U.S. at 99-100.  Plaintiffs here allege no such dilemma.

In short, plaintiffs have not established a threat of prosecution that is sufficiently concrete to "give[] rise to the requisite 'injury in fact' and thus give[] [them] standing," Navegar, 103 F.3d at 1001.  Thus, they cannot maintain this suit absent some showing that they have been injured by a circumstance other than the prospective enforcement of the statutes they challenge.

**B.  Plaintiffs Have Not Established Any Other Injury Sufficient To Support Article III Standing.**

**1.  Dearth Has Not Established Any Injury-In-Fact.**

Dearth's inability to purchase firearms in 2006 and 2007, J.A. 18, does not establish his standing to bring this action for prospective relief.  As the Supreme Court has explained, "the fact

21

of past injury, while presumably affording the plaintiff standing to claim damages, does nothing to establish a real and immediate threat that he would again suffer similar injury in the future," which is a necessary requirement for "standing to seek forward-looking relief." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 210, 211 (1995) (brackets, ellipsis, and quotation marks omitted)). To "maintain [a] claim for forward-looking relief," a plaintiff must establish an "'actual or imminent'" injury, id. at 211 (quoting Lujan, 504 U.S. at 555), through the demonstration of "continuing, present adverse effects," O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974), or "a sufficient likelihood of future injury," Haase v. Sessions, 835 F.2d 902, 911 (D.C. Cir. 1987). See also City of Los Angeles v. Lyons, 461 U.S. 95, 104-05 (1983).

Dearth's allegations fall short of these requirements. Dearth cannot establish any "present adverse effects," O'Shea, 414 U.S. at 496, relating to his desire "to purchase firearms within the United States," J.A. 15, because he is not in the United States, and thus not presently within the ambit of the restrictions that he challenges. He cannot establish a "likelihood of future injury," Haase, 835 F.2d at 911, because he has alleged no facts demonstrating that his future exposure to these restrictions is more than "conjectural," Golden v. Zwickler, 394 U.S. 103, 109 (1969). In Golden, the Supreme Court dismissed a complaint where the plaintiff's sole concern was his ability to distribute

22

election-related literature about a particular Congressman, and the prospect of another campaign involving the Congressman "was neither real nor immediate." Ibid. As the Court explained, the plaintiff's general assertion that "the former Congressman can be a candidate for Congress again," was insufficient to establish "that this [was] a prospect of immediacy and reality." Ibid. (internal quotation marks omitted).

Dearth's inchoate plans to visit the United States are similarly lacking in the "immediacy and reality" necessary to make his future exposure to the challenged restrictions anything more than "conjectural." See ibid. (internal quotation marks omitted). It is well established that "'[s]ome day' intentions -- without any description of concrete plans, or indeed even any specification of when the same day will be -- do not support a finding of the 'actual or imminent' injury" that Article III requires. Lujan, 504 U.S. at 564. In Lujan, the Supreme Court found no Article III injury sufficient to support declaratory relief where the plaintiffs alleged that they had visited the putatively affected sites before and "inten[ded] to return." 504 U.S. at 564 (internal quotation marks omitted)). Similarly, in Haase, this Court explained that a plaintiff challenging a policy applicable to travelers entering the United States from Nicaragua could not establish standing to sue by "assert[ing] generally that he might

23

one day return to Nicaragua." 835 F.2d at 911. The Court stated
that "[m]ore immediate and concrete plans are necessary." Ibid.

The complaint here alleges that Dearth "has many friends and
relatives" in the United States "whom he enjoys visiting, and whom
he intends to continue visiting on a regular basis," J.A. 15. But
these allegations, like the allegations found inadequate in Lujan
and Haase, "fail[] to show that he will soon expose himself," 504
U.S. at 564 n.2 (emphasis added), to any policy that might thwart
his desire "to purchase firearms within the United States," J.A.
15. Cf. Aderand, 515 U.S. at 211 (looking to whether the plaintiff
demonstrated that it would be exposed to the challenged policy
"sometime in the relatively near future"). This requirement, far
from being a mere formality, serves the purpose of "ensur[ing] that
the alleged injury is not too speculative for Article III
purposes." Lujan, U.S. at 564 n.2. And it is not satisfied "when,
as here, the plaintiff alleges only an injury at some indefinite
future time, and the acts necessary to make the injury happen are
at least partly within the plaintiff's own control." Ibid.

Plaintiffs seek to circumvent these requirements by
characterizing Dearth's prior unsuccessful attempts to purchase
firearms as "administrative denials." Appellant Br. 17. But there
is no allegation that these episodes involved the denial of any
application by a governmental body or, in fact, that plaintiffs
would have submitted any such application absent the restrictions

24

that they challenge.[8]  Thus, plaintiffs cannot establish standing

through reliance on cases involving the District of Columbia's

denial of a specific claimant's application for a gun license,

Parker v. District of Columbia, 478 F.3d 370, 376 (D.C. Cir. 2007),

aff'd sub. nom. District of Columbia v. Heller, 128 S. Ct. 2783

(2008); the State of New York's presumed denial of a plaintiff's

application for a license to carry a concealed weapon, Bach v.

Pataki, 408 F.3d 75, 82-83 (2d Cir. 2005); and the Federal

Communication Commission's policy against granting broadcast

licenses to low-power radio broadcasters, Grid Radio v. Federal

Communication Commission, 278 F.3d 1314, 1319 (D.C. Cir. 2002).[9]

See Appellant Br. 17-21.  And plaintiffs point to no cases treating

the failure of a transaction with a private party as "a license or

permit denial."  Parker, 478 F.3d at 376.

    Indeed, Dearth's allegations fall far short of the showing

---

    [8] Form 4473 is a "firearms transaction record" maintained by
a federally licensed firearms dealer, see 27 C.F.R. § 478.124(a),
not a form submitted by an individual to an agency.

    [9] The "license [and] permit denial" cases discussed by this
Court in Parker, 478 F.3d at 376, are inapposite for the same
reason.   See District Intown Properties Ltd. v. District of
Columbia, 198 F.3d 874 (1999) (District of Columbia's denial of a
building permit); Cassell v. Federal Communication Commission, 154
F.3d 478, 480 (D.C. Cir. 1998) (denial of a license application by
the Federal Communication Commission); Wilkett v. I.C.C., 710 F.2d
861, 863 (D.C. Cir. 1983) (denial of a license application by the
Interstate Commerce Commission); City of Bedford v. FERC, 718 F.2d
1164, 1168 (1983) (denial of a permit by the Federal Energy
Regulatory Commission); Berger v. Bd. of Psychology Examiners,
521 F.2d 1056 (D.C. Cir. 1975) (District of Columbia's denial of a
license to practice psychology).

that this Court, in Parker, found sufficient to establish
Article III standing.  The Court in Parker held that standing had
been established by a plaintiff who was "not asserting that his
injury is only a threatened prosecution, nor . . . claiming only a
general right to handgun ownership," but, rather, was "asserting a
right to a registration certificate" from the District of Columbia,
"the denial of which is his distinct injury."  Ibid.  Dearth has
asserted no right to any license or permit from any governmental
entity.  He alleges only that he wishes "to purchase firearms
within the United States," J.A. 15, and that he "cannot make a
retail purchase of a firearm if he truthfully declines to provide
a state of residence" to a firearms seller, id. at 18.  This
allegation, which amounts to the claim of a right to purchase
firearms, is even less substantial than the claim to "a general
right to handgun ownership" that the Court found inadequate in
Parker, see 478 F.3d at 376.[10]  And, in any event, such generalized
assertions of right are insufficient to satisfy constitutional
standing requirements.  The Supreme Court has "consistently held
that a plaintiff raising only a generally available grievance about
government . . . and seeking relief that no more directly and
tangibly benefits him than it does the public at large . . . does

---

[10] Federal law allows Dearth to continue to own and possess
firearms while in the United States if those firearms were lawfully
purchased during the time that he had a residence in the United
States.  See 18 U.S.C. § 925(d).

26

not state an Article III case or controversy." <u>Lujan</u>, 504 U.S. at 573-74.

### 2. No Injury-In-Fact Has Been Established By The Second Amendment Foundation.

The complaint does not identify any injury that the Second Amendment Foundation or its members have sustained as a result of the challenged statutes. The Foundation cannot establish standing to sue merely by alleging, without more, that its "purposes . . . include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control," J.A. 14. It is well-established that "conflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing." <u>Nat'l Treasury Employees Union v. United States</u>, 101 F.3d 1423, 1429 (D.C. Cir. 1996). As this Court has explained, "[f]rustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" <u>Ibid.</u> (quoting <u>Nat'l Taxpayers Union, Inc. v. United States</u>, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). "[P]ersons cannot obtain judicial review of otherwise non-justiciable claims simply by incorporating, drafting a mission statement, and then suing on behalf of the newly formed and extremely interested organization." <u>Ibid.</u>

Plaintiffs' reliance on <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363 (1982), is misplaced. Unlike the organization bringing suit in <u>Havens</u>, plaintiffs here make no showing that their

27

activities have been in any way impeded by the challenged restrictions. In Havens, the organization "alleged that the defendant's unlawful housing practices 'frustrated' the organization's efforts 'to assist equal access to housing'" and further alleged that "it 'had to devote significant resources to identify and counteract the defendant's' unlawful housing practices." Nat'l Treasury Employees Union, 101 F.3d at 1428 (quoting Havens, 455 U.S. at 379). "According to the Court, '[s]uch concrete and demonstrable injury to the organization's activities –– with the consequent drain on the organization's resources –– constitutes far more than simply a setback to the organization's abstract social interests.'" Ibid. (quoting Havens, 455 U.S. at 379).

This Court, similarly, has insisted on a showing that "a defendant's conduct has made the organization's activities more difficult." Id. at 1430 (emphasis omitted). In Spann v. Colonial Village, Inc., 899 F.2d 24 (D.C. Cir. 1990), the Court concluded that an organization had standing to sue on its own behalf based on the allegation that defendants' "discriminatory ads required [the organization] to 'devote scarce resources to identify and counteract defendants' advertising practices' and also 'necessitated increased education efforts' to inform the public about laws prohibiting discrimination in housing." Nat'l Treasury Employees Union, 101 F.3d at 1429 (quoting Spann, 899 F.2d at 28).

28

The Court explained that "because these programs would act as a 'drain on the organizations' resources,' [the organization's] allegations were sufficient to establish standing to sue." Ibid. (quoting Spann, 899 F.2d at 28). Likewise, in Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp, 28 F.3d 1268 (D.C. Cir. 1994), the Court determined that Article III standing had been established by an organization alleging that the defendant's "discriminatory actions interfered with" the organization's "community outreach, counseling, and research projects," requiring the organization "to expend resources to counteract BMC's alleged discrimination." Nat'l Treasury Employees Union, 101 F.3d at 1429 (quoting Fair Employment Council, 28 F.3d at 1276 (brackets and ellipses omitted)). And in Abigail Alliance For Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 132-33 (D.C. Cir. 2006), the Court found organizational standing where the organization alleged that "[t]he challenged regulations have caused a drain on [the organization's] resources and time because the organization has had to divert significant time and resources from these activities toward helping its members and the public address the unduly burdensome requirements that the FDA imposes on experimental treatments."

Plaintiffs have not made any such showing. Their complaint is devoid of any statement that the challenged statutes have affected the activities of the Foundation in any manner.

29

Plaintiffs have also failed to establish that the Second Amendment Foundation has standing to sue as a representative of its members. The complaint makes no showing that the Foundation's "members would otherwise have standing to sue in their own right," Abigail Alliance, 469 F.3d at 133 (quotation marks omitted). Indeed, it contains no allegations at all regarding any injuries suffered by the Foundation's members, stating only that the Foundation has "over 650,000 members and supporters nationwide." J.A. 14. This description of the Foundation's membership suggests that the Foundation would lack standing even if Dearth managed to establish a right to sue, because Dearth is "a resident of Canada" who "does not currently maintain a residence within the United States," ibid. As the district court correctly noted, the Foundation "cannot meet the first requirement" for representational standing because it has made no showing "that it has any members who are U.S. citizens residing abroad who intend to purchase firearms domestically in violation of the laws at issue." Id. at 10-11.

**C.  Because Plaintiffs Have Failed To Establish Any Injury Sufficient To Support Article III Standing, Their Suit Must Be Dismissed.**

For the foregoing reasons, plaintiffs lack standing to bring this lawsuit. The district court concluded that plaintiffs lacked standing to pursue a pre-enforcement challenge because they failed to establish that they have been "personally threatened with

30

prosecution" or that their "prosecution has a special priority for the government."  J.A. 7 (quoting Seegars, 396 F.3d 1248).  The court was correct in noting the absence of any such showing and in further observing that, under this Court's decisions, plaintiffs' failure to make this showing defeats their attempt to establish standing on the basis of a prospective threat of enforcement.  As this Court has explained, "[f]or preenforcement challenges to a criminal statute not burdening expressive rights and not in the form of appeal from an agency decision," Seegars, 396 F.3d at 1253, plaintiffs "must demonstrate an imminent threat" of prosecution, Ord, 587 F.3d at 1140 (quotation marks omitted), which requires plaintiffs to show "that their prosecution results from a special law enforcement priority, namely that they have been 'singled out or uniquely targeted by the government for prosecution,'" id. at 1140-41 (quoting Parker, 478 F.3d at 375 (ellipsis omitted)).

Plaintiffs mistakenly contend that this requirement "literally contradicts Medimmune by actually requiring a plaintiff to break a criminal law in order to test its constitutionality."  Appellant Br. 37.  The Supreme Court in Medimmune explained that, where a "genuine threat of enforcement" exists, a plaintiff's "eliminat[ion] [of] the imminent threat of harm by simply not doing what he claimed the right to do" will "not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced."  549 U.S. at 129.  As this Court has

31

explained, however, "Navegar . . . demonstrates" this Court's recognition "that imminence is not defeated simply because the plaintiff complies with the challenged statute." Ord, 587 F.3d at 1143. The Court in Navegar "acknowledged that plaintiffs had ceased manufacturing the banned weapons but ruled that such compliance did not extinguish their preenforcement standing," 587 F.3d at 1143 (citation omitted), because "it is the threat of prosecution which creates the 'injury in fact' required under standing doctrine, for the threat forces [the plaintiffs] to forego the manufacture and transfer of the weapons specified in the Act," ibid. (quoting Navegar, 103 F.3d at 1001 (brackets and ellipsis omitted)).

Here, plaintiffs have failed to establish a threat of prosecution sufficient to create an injury-in-fact because, as explained above, they have failed to demonstrate a concrete intention to engage in conduct that would expose them to the challenged provisions. And in the absence of such likely exposure, they cannot show that any "threat-eliminating behavior was effectively coerced," Medimmune, 549 U.S. at 129, or that they have suffered any injury independent of any threat of prosecution. The district court therefore properly dismissed this suit.[11]

---

[11] Because, as discussed above (supra pp. 12-27), plaintiffs' pre-enforcement challenge fails for more fundamental reasons than their ability to show an "imminent threat" of prosecution, Ord, 587 F.3d at 1140 (quotation marks omitted), their attack on this Court's precedents, Appellant Br. 30-44, is beside the point.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

TONY WEST
  Assistant Attorney General

RONALD C. MACHEN, JR.
  United States Attorney

MARK B. STERN
  (202) 514-5089
MICHAEL S. RAAB
  (202) 514-4053
/s/ Anisha S. Dasgupta
ANISHA S. DASGUPTA
  (202) 514-5428
  Attorneys, Appellate Staff
  Civil Division, Room 7533
  U.S. Department of Justice
  950 Pennsylvania Ave, NW
  Washington, D.C. 20530-0001

AUGUST 2010

33

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 7600 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a monospaced typeface using Courier typeface with 12-point type.


  /s/ Anisha S. Dasgupta
    Anisha S. Dasgupta
    Attorney for Appellee

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2010, I filed and served the foregoing Brief for the Federal Appellee with the Clerk of the Court by causing a copy to be electronically filed via the appellate CM/ECF system.  I also hereby certify that on or before August 23, 2010, I will cause eight copies to be delivered to the Court via hand delivery.  I also hereby certify that counsel for Appellants is a registered CM/ECF user and will be served via the CM/ECF system.


  /s/ Anisha S. Dasgupta
        Anisha S. Dasgupta
        Attorney for Appellee

ADDENDUM

## TABLE OF CONTENTS

**<u>Page</u>**

27 C.F.R. § 478.11 . . . . . . . . . . . . . . . . . . . . . . . a-1

27 C.F.R § 478.29a . . . . . . . . . . . . . . . . . . . . . . . a-1

27 C.F.R. § 478.96 . . . . . . . . . . . . . . . . . . . . . . . a-1

27 C.F.R. § 478.99(a) . . . . . . . . . . . . . . . . . . . . . a-3

27 C.F.R § 478.124 . . . . . . . . . . . . . . . . . . . . . . . a-3

ATF Ruling 80-21 . . . . . . . . . . . . . . . . . . . . . . . a-6

ATF Ruling 81-3 . . . . . . . . . . . . . . . . . . . . . . . a-7

## § 478.11 -- Meaning of terms.

* * *

State of residence.   The State in which an individual resides. An individual resides in a State if he or she is present in a State with the intention of making a home in that State. If an individual is on active duty as a member of the Armed Forces, the individual's State of residence is the State in which his or her permanent duty station is located. An alien who is legally in the United States shall be considered to be a resident of a State only if the alien is residing in the State and has resided in the State for a period of at least 90 days prior to the date of sale or delivery of a firearm. The following are examples that illustrate this definition:

Example 1. A maintains a home in State X. A travels to State Y on a hunting, fishing, business, or other type of trip. A does not become a resident of State Y by reason of such trip.

Example 2. A is a U.S. citizen and maintains a home in State X and a home in State Y. A resides in State X except for weekends or the summer months of the year and in State Y for the weekends or the summer months of the year. During the time that A actually resides in State X, A is a resident of State X, and during the time that A actually resides in State Y, A is a resident of State Y.

Example 3. A, an alien, travels on vacation or on a business trip to State X. Regardless of the length of time A spends in State X, A does not have a State of residence in State X. This is because A does not have a home in State X at which he has resided for at least 90 days.

## § 478.29a -- Acquisition of firearms by nonresidents.

No person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State shall receive any firearms unless such receipt is for lawful sporting purposes.

## § 478.96 -- Out-of-State and mail order sales.

(a) The provisions of this section shall apply when a firearm is purchased by or delivered to a person not otherwise prohibited by the Act from purchasing or receiving it.

(b) A licensed importer, licensed manufacturer, or licensed dealer may sell a firearm that is not subject to the provisions of § 478.102(a) to a nonlicensee who does not appear in person at the

a-1

licensee's business premises if the nonlicensee is a resident of the same State in which the licensee's business premises are located, and the nonlicensee furnishes to the licensee the firearms transaction record, Form 4473, required by § 478.124. The nonlicensee shall attach to such record a true copy of any permit or other information required pursuant to any statute of the State and published ordinance applicable to the locality in which he resides. The licensee shall prior to shipment or delivery of the firearm, forward by registered or certified mail (return receipt requested) a copy of the record, Form 4473, to the chief law enforcement officer named on such record, and delay shipment or delivery of the firearm for a period of at least 7 days following receipt by the licensee of the return receipt evidencing delivery of the copy of the record to such chief law enforcement officer, or the return of the copy of the record to him due to the refusal of such chief law enforcement officer to accept same in accordance with U.S. Postal Service regulations. The original Form 4473, and evidence of receipt or rejection of delivery of the copy of the Form 4473 sent to the chief law enforcement officer shall be retained by the licensee as a part of the records required of him to be kept under the provisions of Subpart H of this part.

(c)(1) A licensed importer, licensed manufacturer, or licensed dealer may sell or deliver a rifle or shotgun, and a licensed collector may sell or deliver a rifle or shotgun that is a curio or relic to a nonlicensed resident of a State other than the State in which the licensee's place of business is located if--

   (i) The purchaser meets with the licensee in person at the licensee's premises to accomplish the transfer, sale, and delivery of the rifle or shotgun;

   (ii) The licensed importer, licensed manufacturer, or licensed dealer complies with the provisions of § 478.102;

   (iii) The purchaser furnishes to the licensed importer, licensed manufacturer, or licensed dealer the firearms transaction record, Form 4473, required by § 478.124; and

   (iv) The sale, delivery, and receipt of the rifle or shotgun fully comply with the legal conditions of sale in both such States.

   (2) For purposes of paragraph (c) of this section, any licensed manufacturer, licensed importer, or licensed dealer is presumed, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both such States.

## § 478.99(a) – Certain prohibited sales or deliveries.

Interstate sales or deliveries. A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in (or if a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business or activity is located: *Provided*, That the foregoing provisions of this paragraph (1) shall not apply to the sale or delivery of a rifle or shotgun (curio or relic, in the case of a licensed collector) to a resident of a State other than the State in which the licensee's place of business or collection premises is located if the requirements of § 478.96(c) are fully met, and (2) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes (see § 478.97).

## § 478.124 – Firearms transaction record.

(a) A licensed importer, licensed manufacturer, or licensed dealer shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearms transaction record, Form 4473: Provided, That a firearms transaction record, Form 4473, shall not be required to record the disposition made of a firearm delivered to a licensee for the sole purpose of repair or customizing when such firearm or a replacement firearm is returned to the person from whom received.

(b) A licensed manufacturer, licensed importer, or licensed dealer shall retain in alphabetical (by name of purchaser), chronological (by date of disposition), or numerical (by transaction serial number) order, and as a part of the required records, each Form 4473 obtained in the course of transferring custody of the firearms.

(c)(1) Prior to making an over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located, the licensed importer, licensed manufacturer, or licensed dealer so transferring the firearm shall obtain a Form 4473 from the transferee showing the transferee's name, sex, residence address (including county or similar political subdivision), date and place of birth; height, weight and race of the transferee; the transferee's country of citizenship; the transferee's INS-issued alien number or admission number; the transferee's State of residence; and certification by the transferee that the transferee is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce.

(2) In order to facilitate the transfer of a firearm and enable NICS to verify the identity of the person acquiring the firearm, ATF Form 4473 also requests certain optional information. This information includes the transferee's social security number. Such information may help avoid

a–3

the possibility of the transferee being misidentified as a felon or other prohibited person.

(3) After the transferee has executed the Form 4473, the licensee:

(i) Shall verify the identity of the transferee by examining the identification document (as defined in § 478.11) presented, and shall note on the Form 4473 the type of identification used;

(ii) Shall, in the case of a transferee who is an alien legally in the United States, cause the transferee to present documentation establishing that the transferee is a resident of the State (as defined in § 478.11) in which the licensee's business premises is located, and shall note on the form the documentation used. Examples of acceptable documentation include utility bills or a lease agreement which show that the transferee has resided in the State continuously for at least 90 days prior to the transfer of the firearm; and

(iii) Must, in the case of a transferee who is a nonimmigrant alien who states that he or she falls within an exception to, or has a waiver from, the nonimmigrant alien prohibition, have the transferee present applicable documentation establishing the exception or waiver, note on the Form 4473 the type of documentation provided, and attach a copy of the documentation to the Form 4473.

(iv) Shall comply with the requirements of § 478.102 and record on the form the date on which the licensee contacted the NICS, as well as any response provided by the system, including any identification number provided by the system.

(4) The licensee shall identify the firearm to be transferred by listing on the Form 4473 the name of the manufacturer, the name of the importer (if any), the type, model, caliber or gauge, and the serial number of the firearm.

(5) The licensee shall sign and date the form if the licensee does not know or have reasonable cause to believe that the transferee is disqualified by law from receiving the firearm and transfer the firearm described on the Form 4473.

(d) Prior to making an over-the-counter transfer of a shotgun or rifle under the provisions contained in § 478.96(c) to a nonlicensee who is not a resident of the State in which the licensee's business premises is located, the licensee so transferring the shotgun or rifle, and such transferee, shall comply with the requirements of paragraph (c) of this section: *Provided*, That in the case of a

a-4

transferee who is an alien legally in the United States, the documentation required by paragraph (c)(3)(ii) of this section need only establish that the transferee is a resident of any State and has resided in such State continuously for at least 90 days prior to the transfer of the firearm. Examples of acceptable documentation include utility bills or a lease agreement. The licensee shall note on the form the documentation used.

(e) Prior to making a transfer of a firearm to any nonlicensee who is not a resident of the State in which the licensee's business premises is located, and such nonlicensee is acquiring the firearm by loan or rental from the licensee for temporary use for lawful sporting purposes, the licensed importer, licensed manufacturer, or licensed dealer so furnishing the firearm, and such transferee, shall comply with the provisions of paragraph (c) of this section, except for the provisions of paragraph (c)(3)(ii).

(f) Form 4473 shall be submitted, in duplicate, to a licensed importer, licensed manufacturer, or licensed dealer by a transferee who is purchasing or otherwise acquiring a firearm by other than an over-the-counter transaction, who is not subject to the provisions of § 478.102(a), and who is a resident of the State in which the licensee's business premises are located. The Form 4473 shall show the name, address, date and place of birth, height, weight, and race of the transferee; and the title, name, and address of the principal law enforcement officer of the locality to which the firearm will be delivered. The transferee also must date and execute the sworn statement contained on the form showing, in case the firearm to be transferred is a firearm other than a shotgun or rifle, the transferee is 21 years or more of age; in case the firearm to be transferred is a shotgun or rifle, the transferee is 18 years or more of age; whether the transferee is a citizen of the United States; the transferee's State of residence, and in the case of a transferee who is an alien legally in the United States, the transferee has resided in that State continuously for at least 90 days prior to the transfer of the firearm; the transferee is not prohibited by the provisions of the Act from shipping or transporting a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce; and the transferee's receipt of the firearm would not be in violation of any statute of the State or published ordinance applicable to the locality in which the transferee resides. Upon receipt of such Forms 4473, the licensee shall identify the firearm to be transferred by listing in the Forms 4473 the name of the manufacturer, the name of the importer (if any), the type, model, caliber or gauge, and the serial number of the firearm to be transferred. The licensee shall prior to shipment or delivery of the firearm to such transferee, forward by registered or certified mail (return receipt requested) a copy of the Form 4473 to the principal law enforcement officer named in the Form 4473 by the transferee, and shall delay shipment or delivery of the firearm to the transferee for a period of at least 7 days following receipt by the licensee of the return receipt evidencing delivery of the copy of the Form 4473 to such principal law enforcement officer, or the return of the copy of the Form 4473 to the licensee due to the refusal of such principal law enforcement officer to accept same in accordance with U.S. Postal Service regulations. The original Form 4473, and evidence of receipt or rejection of delivery of the copy of the Form 4473 sent to the principal law enforcement officer, shall be retained by the licensee as a part of the records required to be kept under this subpart.

(g) A licensee who sells or otherwise disposes of a firearm to a nonlicensee who is other than an individual, shall obtain from the transferee the information required by this section from an individual authorized to act on behalf of the transferee. In addition, the licensee shall obtain from the individual acting on behalf of the transferee a written statement, executed under the penalties of perjury, that the firearm is being acquired for the use of and will be the property of the transferee, and showing the name and address of that transferee.

(h) The requirements of this section shall be in addition to any other recordkeeping requirement contained in this part.

(i) A licensee may obtain, upon request, an emergency supply of Forms 4473 from any Director of Industry Operations. For normal usage, a licensee should request a year's supply from the ATF Distribution Center (See § 478.21).

## ATF Rul. 80-21

**An out-of-State college student may establish residence in a State by residing and maintaining a home in a college dormitory or in a location off-campus during the school term.**

"State of residence" is defined by regulation * * * as the State in which an individual regularly resides or maintains a home. The regulation also provides an example of an individual who maintains a home in State X and a home in State Y. The individual regularly resides in State X except for the summer months and in State Y for the summer months of the year. The regulation states that during the time the individual actually resides in State X he is a resident of State X, and during the time he actually resides in State Y he is a resident of State Y.

Applying the above example to out-of-State college students **it is held**, that during the time the students actually reside in a college dormitory or at an off-campus location they are considered residents of the State where the dormitory or off-campus home is located. During the time out-of-State college students actually reside in their home State they are considered residents of their home State.

a–6

## ATF Rul. 81-3

**Nonresident U.S. citizens returning to the United States and nonresident aliens lawfully immigrating to the United States may obtain a permit to import firearms acquired outside of the United States, provided such firearms may be lawfully imported.**

Section 922(a)(3) of Title 18, United States Code, makes it unlawful, with certain exceptions, for a person to bring into his State of residence a firearm which he acquired outside that State. An unlicensed resident of a State must, therefore, arrange for the importation of the firearm through a Federal firearms licensee.

The definition of "State of residence" * * * provides that the State in which an individual regularly resides or maintains a home is the State of residence of that person. U.S. citizens who reside outside of the United States are not residents of a State while so residing. A person lawfully immigrating to the United States is not a resident of a State unless he is residing and has resided in a State for a period of at least 90 days. Therefore, such persons are not precluded by section 922(a)(3) from importing into the United States any firearms acquired outside of the United States that may be lawfully imported. The firearms must accompany such persons since once a person is in the United States and has acquired residence in a State he may import a firearm only by arranging for the importation through a Federal firearms licensee.

As applicable to this ruling, 18 U.S.C. § 925(d) provides that firearms are importable if they are generally recognized as particularly suitable for, or readily adaptable to, sporting purposes, excluding National Firearms Act (NFA) firearms and surplus military firearms.

**Held:** a nonresident U.S. citizen returning to the United States after having resided outside of the United States, or a nonresident alien lawfully immigrating to the United States, may apply for a permit from ATF to import for personal use, not for resale, firearms acquired outside of the United States without having to utilize the services of a Federal firearms licensee. The application on ATF Form 6 Part I (7570.3A), Application and Permit for Importation of Firearms, Ammunition and Implements of War, should include a statement, on the application form or on an attached sheet, that:

(1) the applicant is a nonresident U.S. citizen who is returning to the United States from a residence outside of the United States or, in the case of an alien, is lawfully immigrating to the United States from a residence outside of the United States; and

(2) the firearms are being imported for personal use and not for resale.